UNITED STATES of America,
Appellee,

v.

Clifford E. PAYNE, Appellant.

UNITED STATES of America,
Appellee,

v.

Roland PAYNE, Appellant.

UNITED STATES of America,
Appellee,

v.

Hubert PAYNE, Appellant.

Nos. 73–1199, 73–1200 and 73–1201.

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 16, 1973.

Decided Feb. 8, 1974.

C. Thomas Seay, Welch, W. Va. (Court-appointed counsel), for appellant in No. 73–1199.

Robert W. Hensley, Bluefield, W. Va. (Court-appointed counsel), for appellant in No. 73–1200.

Mary M. Dunn, Huntington, W. Va. (Court-appointed counsel), for appellant in No. 73–1201.

Robert B. King, Asst. U. S. Atty. (John A. Field, III, U. S. Atty., on brief), for appellee in Nos. 73–1199, 73–1200 and 73–1201.

Before HAYNSWORTH, Chief Judge, and WINTER and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

Clifford Payne, Roland Payne and Hubert Payne were found guilty of conspiracy to violate 18 U.S.C.A. § 472 by obtaining, possessing and passing counterfeit $10 Federal Reserve Notes. Each was sentenced to imprisonment. Three other co-defendants, including their brother Burrell, pleaded guilty to the same indictment. Clifford, Roland and Hubert attack the validity of their con-

victions on the ground that the district court erroneously and unconstitutionally admitted into evidence a written, un-signed statement of Burrell implicating them. Before the statement was admitted, Burrell was produced as a witness and testified that he neither remembered the events described in the statement nor the fact of making the statement. Hubert also attacks his conviction on the additional ground that a money order, on which "Hubert Payne" was designated in handwriting as the sender, was improperly admitted into evidence because there was no proof that the handwriting was his.

We see no merit in either contention, and we affirm.

## I.

At the trial of Clifford, Roland and Hubert Payne, Burrell Payne, who had previously pleaded guilty, was called as a witness for the government. When interrogated, he remembered and recognized his brothers. He claimed no recollection of having pleaded guilty, but he did not dispute that fact. He claimed no recollection of having talked to any "federal men" at his home in Wytheville, Virginia, on July 11, 1972, and he denied any recollection of having passed any counterfeit money. Again, however, he did not dispute either fact, but said simply that he had no recollection. A writing, later identified as an unsigned partial statement taken by a member of the Secret Service, was exhibited to him, but it failed to refresh his recollection either of the events set forth in the statement, or of the fact that the interview had taken place. Burrell made reference to the fact that he had been a patient at a state mental hospital and was still an out-patient and on medication. He also mentioned an accident when he fell down some steps while he was holding an eighty pound power tool and suffered some temporary paralysis and loss of memory thereafter.[1]

Special Agent, Peter M. Donald, Jr., of the Secret Service, was then called as a witness. Agent Donald said that he and two other Secret Service agents talked to Burrell at Burrell's home in Wytheville, Virginia, on January 11, 1972. The interview began in an automobile in front of the residence and then adjourned inside to the kitchen for the purpose of taking a written statement from Burrell. There, Agent Donald interrogated Burrell and wrote his answers. In the words of Agent Donald "[h]e [Burrell] was providing the facts and I was writing them down on a piece of paper." Agent Donald testified that as the interview in the kitchen progressed, Burrell complained of dizziness, headache and loss of memory, and by mutual agreement the taking of the statement was terminated. Agent Donald was of the view that, until Burrell terminated the interview, his memory then was far better than it appeared in court; Burrell appeared "perfectly normal" and related instances which he said had occurred two or three months earlier. Burrell did not sign the statement; but Agent Donald testified that his transcription of Burrell's statement was accurate to the point that Burrell terminated the interview, and Agent Donald's verification is not challenged on appeal.

Over defendant's objection, the district court admitted the statement, and it was exhibited to the jury. It recorded that Burrell had been advised of his constitutional right not to make a statement, that anything he said could be used against him, and that he concluded to make a statement of his own free will and accord without promise of immunity. It set forth that sometime in November, 1971, he obtained from his brother Hubert thirty-five counterfeit $10 bills, apparently as a gift, and he passed them, with the help of Richard Stanley, a co-defendant, at various places in western Virginia and southern West Virginia. Nine of the notes were

1. His brother Chester, a defendant who appealed, testified that Burrell has *not* had memory problems since the accident.

passed by Stanley to purchase a money order at the Piggly-Wiggly store in Grundy, Virginia, and the money order was given to Hubert. Burrell obtained additional counterfeit $10 bills from Hubert on a second occasion, and this time paid him $20 for each $100 of counterfeits. The statement also set forth that "I believe my brothers Roland, Clifton and Chester also had some counterfeits." The statement concluded with the inscription that it was incomplete and unsigned because "subject complains of lapses of memory and dizzy spells," and there followed Special Agent Donald's signature.

The evidence concerning the money order, which is the subject of Hubert's second ground of appeal, was that it was in the amount of $84.63 and was sold at a Piggly-Wiggly store in Grundy, Virginia, to Burrell and an unidentified man for nine counterfeit $10 bills, and that in the printed block for the name of the sender, the name of "Hubert Payne" had been inserted in handwriting. There was no evidence who wrote in the name, but there was evidence that the money order had been cashed in Columbus, Ohio, where Hubert Payne was shown to have lived.

## II.

■ As we see the issue of the admissibility of the statement, it involves the consideration of two aspects of the law—the general law of evidence and the effect of the Confrontation Clause guarantee. We proceed to these considerations *seriatim:*

A. As a rule of evidence, there are opposing views as to whether recorded past recollection may be admitted into evidence as a permissible exception to the rule excluding hearsay evidence. The authorities are collected in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), where it is said that a majority of the courts hold that such recorded past recollection may not be offered "to show the truth of the matters asserted therein, but can be introduced under appropriate limiting in-

structions to impeach the credibility of the witness who has changed his story at trial," 399 U.S. at 154, 90 S.Ct. at 1933. The survey and analysis of the authorities contained in *Green* also discloses that "the minority view adopted in some jurisdictions and supported by most legal commentators and by recent proposals to codify the law of evidence would permit the substantive use of prior inconsistent statements on the theory that the usual dangers of hearsay are largely nonexistent where the witness testifies at trial." 399 U.S. at 155, 90 S.Ct. at 1933.

Some of the members of the panel, if faced with the necessity of choosing between majority and minority views in the instant case, would prefer to cast their lot with the minority view and hold that Burrell's statement was admissible, as recorded past recollection, to prove the truth of its contents. They would be strongly influenced by the potential fostering of perjury, in a case like the instant one where the accuracy of the prior recorded recollection was impressively demonstrated by the testimony of the agent, by the adoption of a rule which would encourage Burrell to feign a failure of recollection, on his own or at the instance of his brothers. But it is unnecessary to make the choice between majority and minority rules in this case. This is so because, even in those jurisdictions following the majority view (See e. g., United States v. Cunningham, 446 F.2d 194 (2 Cir. 1971); United States v. Pacelli, 470 F.2d 67 (2 Cir. 1972), cert. den. 93 U.S. 1501, 93 S. Ct. 1501, 36 L.Ed.2d 178 (March 19, 1973)), prior inconsistent statements of a witness available for cross-examination may be received as affirmative proof when they were made at a former trial, or before a grand jury. United States v. Mingoia, 424 F.2d 710, 713 (2 Cir. 1970); United States v. Insana, 423 F.2d 1165, 1170 (2 Cir.), cert. den. 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970). The rationale of these exceptions to the majority rule is that the fact of an oath or possible cross-exami-

nation provide sufficient assurances of reliability that the statement ought to be admitted as substantive evidence of the facts it contains.

Following submission of the instant appeals, we required Burrell's arraignment to be transcribed and submitted to us. Our study of it persuades us that his statement was sufficiently tested as to reliability that it, too, ought to be held admissible to prove the truth of its contents, even though technically it had not been sworn to, or he cross-examined.

On June 12, 1972, about six months prior to the retrial of Clifford, Roland and Hubert at which Burrell testified,[2] Burrell came on for arraignment. Initially, he entered a plea of not guilty; his motion to sever his case from that of his brothers was granted; and his case was set for trial on July 24. After·the court's luncheon recess, Burrell communicated to the court his desire to change his plea to one of guilty. In full compliance with Rule 11, F.R.Cr.P., Burrell was interrogated to demonstrate the voluntary nature of his tender of a plea of guilty and his understanding of the nature of the charge and the possible consequences of the plea, if accepted. He evidenced no difficulty in understanding or responding to the ·court's interrogation of him. Additionally his counsel affirmed that Burrell understood what he was doing in entering a guilty plea to the indictment. Then the court proceeded to the requirement of Rule 11 that he determine if there was a factual basis for the plea.

Peter M. Donald, Jr., who had taken Burrell's statement was then sworn and testified. After describing how he learned of the crime and a statement given by Chester, he testified how he and other agents interviewed Burrell and essentially what Burrell had told him. The substance of his testimony was in accord with the statement's contents. Although Burrell was not specifically asked if he controverted the

agent's testimony in whole or in part, he was asked if he had been advised of his constitutional rights and if he had signed a waiver before he was questioned and he replied affirmatively.

Of course, Burrell's statement was not admitted at his arraignment, nor the aspect implicating Roland, Clifford and Chester described. The agent did testify however that Burrell had implicated Hubert and Richard Stanley. Admittedly also, Burrell was not specifically asked if he controverted the results of his interview, but there can be no question in our minds that Burrell's attention was directed to his statement, that he had ample opportunity to disavow the fact of the interview and what was discussed, or to assert his lack of recollection of all or any part of it, and that his silence, in the presence of the court, amounted to tacit admissions that the interview took place, that he remembered it and that he acknowledged the correctness of Mr. Donald's testimony of his answers. Our conclusion is fortified by his affirmative response when questioned about his being advised of his constitutional rights, a fact recorded in the statement.

In short, we think that, under the special facts of this case, the reliability of the record of Burrell's past recollection was sufficiently established that admission of the record into evidence was not barred by mechanical application of the rule against hearsay testimony.

■ B. We see no constitutional impediment in the sixth amendment right of confrontation to the admission of the statement. In California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the Court upheld the validity of a California statute which provided ·that the hearsay rule would not render inadmissible a statement made by a witness if the statement was inconsistent with the testimony of the witness at the trial and the witness was given the opportunity to explain or deny his prior state-

---

2. Their original trial on September 7 resulted in a mistrial because of the inability of the jury to agree.

ment. In the case, both a transcript of a preliminary hearing and an unsworn statement to a police officer were admitted to prove the truth of the matters asserted therein, when a witness at trial claimed a failure of recollection of those matters. Specifically, the witness, a drug user who had previously identified the accused as his supplier, testified at the trial that he was uncertain of who was his supplier because he had been under the influence of drugs. The contention was advanced that such use of a statement violated the Confrontation Clause, but the Court rejected the argument with respect to the testimony at the preliminary hearing and held that the sixth amendment did not preclude admission of such a statement when the witness was sworn and subject to cross-examination at both the preliminary hearing and at trial. The Court did not decide the constitutional validity of the admission of the witness' unsworn statement to a police officer, because it concluded that the issue was not ripe for adjudication.

Admittedly, California v. Green does not decide the precise issue before us; here, we are concerned with an unsworn statement to a police officer and a claimed *total* failure of recollection at trial. It did comment that

> [v]iewed historically . . . there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.

399 U.S. at 158, 90 S.Ct. at 1935. And, after stating that the Confrontation Clause insures that the witness will testify under oath, that the witness will be subjected to cross-examination and that the jury will have the opportunity to assess credibility, the Court added:

> [i]t is, of course, true that the out-of-court statement may have been

made under circumstances subject to none of these protections. But if the declarant is present and testifying at trial, the out-of-court statement for all practical purposes regains most of the lost protections . . . . the inability to cross-examine the witness at the time he made his prior statement cannot easily be shown to be of crucial significance as long as the defendant is assured of full and effective cross-examination at the time of trial."

399 U.S. at 158–159,[3] 90 S.Ct. at 1935.

Notwithstanding the apparent breadth of some of the statements quoted, the Court reserved the question of the admissibility of the unsworn statement to the police officer, saying, "we find little reason to distinguish among prior inconsistent statements on the basis of the circumstances under which the prior statements were given," *but* "Porter [the witness] claimed at trial that he could not remember the events that occurred," and "[w]hether Porter's apparent lapse of memory so affected Green's right to cross-examine as to make a critical difference in the application of the Confrontation Clause . . . is an issue which is not ripe for decision at this juncture." 339 U.S. at 168–169, 90 S.Ct. at 1940–1941. Mr. Justice Harlan, concurring, would have supplied the answer, because he stated his firm conclusion that "the Confrontation Clause of the Sixth Amendment reaches no farther than to require the prosecution to *produce* any *available* witness whose declarations it seeks to use in a criminal trial." 399 U.S. at 174, 90 S.Ct. at 1943. In the course of his opinion, Mr. Justice Harlan added:

> The fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not

---

3. It should be noted, however, that this statement was made on the implied factual basis that the declarant made an inconsistent statement at the trial rather than, as here, claimed, a complete absence of recollection.

454

have Sixth Amendment consequence. The prosecution has no less fulfilled its obligation simply because a witness has a lapse of memory. The witness is, in my view, available. To the extent that the witness is, in a practical sense, unavailable for cross-examination on the relevant facts . . . I think confrontation is nonetheless satisfied.

399 U.S. at 188–189, 90 S.Ct. at 1951. *See also* Mr. Justice Harlan's separate opinion in Dutton v. Evans, 400 U.S. 74, 93, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

While the majority of the Supreme Court has not yet committed itself to the thesis of Mr. Justice Harlan, we think, nevertheless, that under the principles of California v. Green, there was no denial of the right of confrontation in the instant case. Burrell was produced as a witness and he was available for cross-examination. It is true that by reason of Burrell's claim of complete failure of recollection, the scope of effective cross-examination excluded inquiry with regard to the substantive evidence of guilt on the part of Burrell's brothers. But this was no different, except in degree, from a case in which a declarant has made a detailed earlier statement and at the trial, despite efforts to refresh his recollection, remembers only some, but not all, of the details. In such a case, we do not understand that any court, before or after the decision in California v. Green, has held that the Confrontation Clause has been violated by admission of the statement in its entirety, and yet, if defendant's contention is to be accepted, logic would require the exclusion, on constitutional grounds, of any earlier statement where there was only a claim of partial failure of recollection to the extent of the claimed failure of recollection.

Burrell was available for cross-examination about other events contemporaneous with the period of the alleged conspiracy; he could have been cross-examined about possible bias or prejudice toward his brothers; and he could have been interrogated by the government about why he failed to recollect what he had previously said and what pressures, if any, had been exerted upon him by his brothers to encourage his failure of recollection of events incriminating them. The jury would thus have had a substantial basis on which to determine the truthfulness of Burrell's previous statement and full opportunity to observe Burrell's demeanor and manner of testifying so that it could make a determination of whether there was a genuine failure of recollection and its significance on the persuasiveness of his earlier statement. It is true that where complete failure of recollection is claimed, the truth of the earlier statement is not verified by an oath, but as Judge Learned Hand stated in DiCarlo v. United States, 6 F.2d 364, 368 (2 Cir. 1925):

The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court.

It is also true that where complete failure of recollection is claimed the truth of the earlier statement is not tested by cross-examination with regard to its substantive content, but California v. Green, 399 U.S. at 168, 90 S.Ct. at 1940, indicates that we should reverse only if we conclude that "apparent lapse of memory so affected . . . [the] right to cross-examine as to make a critical difference in the application of the Confrontation Clause . . ." For the reasons stated, we cannot reach that conclusion here.

III.

The money order bearing Hubert Payne's name was admitted in connec-

tion with the testimony of Judy Lankford, who was a cashier in a Piggly-Wiggly grocery store in Grundy, Virginia. She testified that her duties included the sale of money orders and she positively identified the money order in question as one which she sold. She also identified the permanent record of the store, indicating that the money order had been sold there. She remembered that she sold the money order to two men who gave her $10 bills which she was subsequently advised were counterfeit and she identified Burrell as one of the men who made the purchase. On its face, the money order showed that it was cashed in Columbus, Ohio, and there was testimony that this was the city of Hubert's residence.

We agree that the name Hubert Payne on the money order, standing alone, had little evidentiary weight to implicate Hubert, but we think that a proper foundation for admission of the money order had been laid and its admission into evidence was not error, even without direct proof of who supplied the writing.

Affirmed.

WIDENER, Circuit Judge (concurring and dissenting):

I concur with the majority as to the admissibility of the money order against Hubert Payne, but as to the admissibility of the out of court statement of Burrell Payne, I respectfully dissent.

We are faced here with a hearsay question and also with the reserved question in *Green*: is the confrontation clause satisfied when the witness, being present, claims he cannot remember the events in question, and the court then admits a prior out of court statement as substantive evidence?

The witness here testified that not only was he unable to remember the events he allegedly discussed in his prior conversation with the Secret Service Agent, but he also could not remember talking with the agent at all. Under such circumstances, the physical presence of the witness was a nullity so far as it touched direct or cross-examination concerning his extrajudicial statement. The defendants were no better off than had the witness been physically unavailable for trial. The admission of the hearsay statement as substantive evidence under the facts of this case is not only a violation of the hearsay rule, it also deprives the defendants of their Sixth Amendment right to be confronted with the witnesses against them.

### The Hearsay Problem

While the majority, by way of dicta, takes the position that Burrell's statement should be admissible under the recorded past recollection exception to the hearsay rule, it does not *hold* the statement so admissible, and bases its conclusion as to admissibility on the supposed inherent reliability of the statement. I am not in agreement with either proposition. I do not think the statement is within the recorded past recollection exception and further believe that it has few, if any, attributes of reliability.

As I understand it, recorded past recollection, in those jurisdictions which follow this exception, is supposed to have earmarks of reliability since it is a writing or recording made when the facts recorded were fresh in the witness' memory and which the witness can testify were accurately recorded. Because of such reliability, recorded past recollection has often been admitted as substantive evidence when the witness cannot remember the facts at the trial, although cross-examination of the witness at the time the statement was made was not had. Under this exception, even though the statement may be read to the jury, it should not be admitted as an exhibit as happened here.[1]

---

1. See Proposed Federal Rules of Evidence, 801(d)(1), Prior Statement of Witness, and 803(5), Recorded Recollection. The Advisory Committee's Notes to each rule are a good discussion of the cases supporting both admissibility and non-admissibility and the rationale supporting each rule as proposed. I take cognizance particularly of the note to

Wigmore's treatise is fraught with examples of when recorded past recollection may be admitted, and all would require as a minimum that the witness verify the accuracy of the record either at trial or at the time it was made.[2] To say that a contrary result here would potentially foster perjury by witnesses feigning failure of recollection is to ignore the equally plausible possibilities that his prior statement was false, or that the person to whom the statement was made would misquote the declarant, or mistakenly transcribe what the declarant said.[3] Furthermore, the trial court concluded that Burrell was not feigning his inability to remember.

The exception that the majority relies upon is outside the existing law of evidence.[4] It recites that prior inconsistent statements of a witness available for cross-examination may be received as substantive evidence where the prior statement was given at a former trial or before a grand jury,[5] but then, ignoring the rule as stated, holds Burrell's guilty plea at his arraignment and his silence in the face of testimony by agent Donald at the arraignment as sufficient to satisfy the requirements. I consider this result unsound and incorrect for at least the following reasons: (1) Burrell's previous guilty plea concerned only his own action, his own guilt; (2) the actual substance of Burrell's prior statement (which was admitted here) was neither admitted in evidence nor referred to at his arraignment; (3) Burrell was not under oath or subject to cross-examination at his arraignment; (4) for all practical purposes, Burrell was not subject to cross-examination at the trial here in question regarding his prior statement; (5) the substance of his statement that implicated the other defendants was never admitted or adopted by Burrell at any judicial proceeding; (6) the ancient rule that the confession of an accomplice may not be received in evidence against another, at least as old as *Tong's Case*, Kelyng 18, 84 Eng. Rep. 1061, 1062 (K.B.1663), is violated. Phillips v. Commonwealth, 202 Va. 207, 116 S.E.2d 282 (1960). The rule, at least until this time, has been "universally accepted." *Dutton*, infra, 400 U.S. 74, at 98, 91 S.Ct. 210, 27 L.Ed.2d 213; (7) admitting the statement makes a shambles of the rule of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), to the effect that co-defendants may not be tried together if the confession of one implicating the other is to be introduced, for insurmountable Sixth Amendment prejudice will result to those not confessing. Of what avail would it be here for Burrell's co-defendants to ask for severance in order to avoid his confession if the confession may be used against them in any event? It is stretching logic too far to say the statement of a witness who re-

Rule 803(5), including the statement that the recorded past recollection exception was not included under Rule 801(d)(1) because that category requires the declarant to be " 'subject to cross-examination' as to which the impaired memory aspect of this exception raises doubts."

2. III Wigmore on Evidence (3d Ed. 1940) (hereinafter, Wigmore) § 746–748 § 751. See also 125 A.L.R. 140, 165 and 82 A.L.R. 2d §§ 29–46 for notes and a collection of cases. See Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) where the witness denied making the statement.

3. Of course, the proponent of the evidence is the one who nearly always stands to profit from the statement being admitted whether the forgetfulness is feigned or in good faith, for in either event the statement gets to the jury without the possibility of cross-examination.

4. A.L.I., Model Code of Evidence (1942), p. 234.

5. I submit *Mingoia* did not admit the previous testimony as affirmative evidence as cited by the majority, rather it held the prior grand jury testimony admissible as a previous inconsistent statement, 424 F.2d at 713. *Insana* did the same. It recited that although such might be admissible under the proposed rules, under "present rules" it "can be considered inconsistent," and had "no occasion to pass upon the broader suggestion," 423 F.2d at 1169. United States v. DeSisto, 329 F.2d 929 (2nd Cir. 1964) did so hold, but there the witness admitted he made the prior statements.

members making it is inadmissible under *Bruton*, but the statement of a witness who does not remember making it is admissible under the majority decision here; (8) the statement itself is unsworn to, unsigned, not in Burrell's handwriting, and was concluded with the inscription that it was incomplete and unsigned because Burrell complained of "lapses of memory and dizzy spells." The statement itself, for these additional reasons, is suspect on its face;[6] (9) we must not forget this prosecution is for conspiracy. The conspiracy ended at the latest November 30, 1971. Burrell's statement was made on January 11, 1972, to a law enforcement officer, and had nothing to do with either the pursuit or furtherance of the conspiracy. Such an out of court declaration of one conspirator, not made in pursuit of and in furtherance of the objectives of the conspiracy, is not admissible against the other conspirators. I know of no federal cases to the contrary. Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953).[6A]

### The Confrontation Problem.

Of more significance here, especially philosophical, is the Sixth Amendment problem of whether or not the defendants were deprived of their right to be confronted with the witnesses against them, which is, as before noted, set in the factual situation reserved by *Green* and there described as a narrow question lurking in the case.

Were the opinion of the court in *Green* a majority opinion, or were the subsequent opinion in *Dutton*, perhaps I would undertake with less alacrity speculation upon the ultimate answer to the reserved question in *Green* and comment upon the historical background of the confrontation clause, and this especially in view of the penetrating and exhaustive concurring opinions in those cases. The concurring opinion of the Chief Justice, however, in *Green*, 399 U.S. p. 171–172, 90 S.Ct. 1930, may seem *sub silentio* to infer that the rule of West v. Louisiana, 194 U.S. 258, 24 S.Ct. 650, 48 L.Ed. 965 (1904), that the States are not necessarily bound by the Sixth Amendment, subject to the limit that "such procedure must not work a denial of fundamental rights," 194 U.S. 258, 263, 24 S.Ct. at 652, is apparently not as dead as might be supposed by the language in Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), where the Sixth Amendment was declared to be "enforced against the States . . . according to the same standard . . . [as] against federal encroachment." Indeed, the Chief Justice, with reason, construes *Green* as not imposing "rigid limits" on the States. And the later holding in *Dutton* [7] lends

---

6. I also note that it may be doubtful if the statement would have been admissible as substantive evidence in a trial of Burrell, for the statement on its face does not comply either with Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), or Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The testimony concerning its taking may be less than conclusive.

6A. The Supreme Court apparently has not considered in the context of admissibility of evidence in a federal court whether or not the statement of a co-conspirator, uttered pursuant to and in furtherance of the conspiracy, is in conflict with the confrontation clause. Cf. *Dutton*, infra. So, to some extent, we write with a clean slate. *Quere*: have the courts and attorneys taken the view, without expressing it, that such statements are not hearsay, but are admissions,

as in the federal Proposed Rules of Evidence, Rule 801(d)(2)(E)? Cf. *Lutwak*, 344 U.S. p. 617, 73 S.Ct. 481, "the agent of the other." For philosophical objections to conspiracy indictments, as well as practical evidence problems, see the concurrence of Mr. Justice Jackson in *Krulewitch*, and Davenport, The Confrontation Clause and Co-conspirator Exception in Criminal Prosecutions, 85 Harv.L.Rev. 1378 (1972).

7. Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), held valid a Georgia statute which allowed a statement by a co-conspirator to be admitted in evidence against another conspirator although the statement was made during the concealment phase of the conspiracy rather than during its pendency to further its purpose. In the case before us, the statement was made well after the conspiracy.

credence to this position. The concurrences of Mr. Justice Harlan in *Green* and *Dutton* make it clear that not only is the scope of the effect of the confrontation clause on the States not yet entirely fixed, but the decisions leave the entire subject of the scope of the confrontation clause less than clear: "[The] . . . decisions have, in my view, left ambiguous whether and to what extent the Sixth Amendment 'constitutionalizes' the hearsay rule. . . . " *Green*, 399 U.S. at 173, 90 S.Ct. at 1943; only a "glimmer of light" is shed by history on its extent, *Green*, at 177, 90 S.Ct. at 1945; "[i]t is common ground that the historical understanding of the clause furnishes no solid guide to adjudication," *Dutton*, 400 U.S., at 95, 91 S.Ct. at 223.

A majority of the Supreme Court has been of opinion that the confrontation right and the hearsay rule are not coextensive, *Green*, 399 U.S. 155, 174, 90 S.Ct. 1930. And Mr. Justice Harlan has correctly noted in *Green*, at 172, 90 S.Ct. 1930, the tendency to indiscriminately equate cross-examination with confrontation. Although he may have modified this reasoning in *Dutton*, where he equates the cross-examination right to a mode of procedure, in my opinion he there states, 400 U.S. at p. 94, 91 S.Ct. 210 the correct conclusion that the confrontation clause was "intended to regulate trial procedure." This construction of the confrontation clause is consistent both with the historical background and most American court decisions until recent years, when the courts commenced chipping away at the rule, even as they did to the statutes of 5 Edw. VI, c. 12, § 22, and 1 & 2 P & M, c. 10 & 11, in the time of Sir Walter Raleigh. These statutes just referred to required in literal and plain English that the witness not only be brought into court in person, if alive in the one case, and if alive and within the realm in the other, but also there "in person before the party accused (arraigned,)" "avow and maintain that which they have to say" (5 Edw. VI), or "say openly in his hearing what they . . . can against him" (1 & 2 P & M).

Development of the hearsay rule began in the middle 1500's when the English court system was evolving to the point where juries for the first time were forced to depend on testimonies offered to them in court, and did not become a settled part of the law until the late 1600's.[8] The most often stated safeguard of the hearsay rule, as it developed and as it is today, is that statements offered testimonially must be subjected to the test of cross-examination.[9] The rule excluding the extra-judicial statement of a witness if the witness were available apparently gained general acceptance following Raleigh's trial.[10] In that case, the damning evidence introduced against Raleigh was the confession of Lord Cobham which implicated Raleigh, and, although Cobham was imprisoned in the very building where Raleigh was being tried, he was never called as a witness.[11] At the time of Raleigh's trial, the general rule was that depositions of absent witnesses were read in court, and oral examination of witnesses was rare;[12] nevertheless, Raleigh's pleas to confront his accuser did, to some extent, become a reality for English defendants who followed shortly after him, so the difficulties of his plight may not have fallen totally on deaf ears.[13]

---

8. Wigmore, § 1364.

9. Wigmore, §§ 1362, 1365. Also see discussion on page 7 that an oath was not required at common law but was merely an incidental feature to cross-examination.

10. Wigmore, § 1364, note 47.

11. Facts taken from Jardine, Criminal Trials I, as reported in Wigmore, § 1364 and Bowen, The Lion and the Throne (1956), Ch. 15–16.

12. Wigmore, § 1364, note 45.

13. Wigmore, § 1364, at 21, note 47. Also see *Green*, supra, at 157, note 10, where the court points out that at least one author (F.

The Sixth Amendment right of a defendant to be confronted with the witnesses against him was apparently not expressed in any of the American colonial charters or enactments. The closest a colonial charter seems to have come to guaranteeing Sixth Amendment trial rights is the Pennsylvania Charter of Privileges, which, in 1701, provided "all criminals shall have the same privilege of witnesses and council as their prosecutors."[14] Upon reflection, such omission was not unusual, since, until the Act of Settlement of William and Mary put the matter to rest, the colonies generally had been considered personal property of the monarch rather than property of the realm. Indeed, the debates of that period between the Crown and the colonies frequently centered around the insistence of the colonies that, since they were the personal property of the Crown, they were not to be subjected to discriminatory acts of Parliament.[15]

While many of the rights later included in the federal Bill of Rights had been granted to the colonies by charter or enactment prior to the end of the colonial period, the trial rights embodied in the Sixth Amendment had not.[16]

It remained for the revolutionary conventions to articulate the trial rights of the people expressed in constitutions, spurred on by, of all people, Lord Coke by his decision in Bonham's Case: "[F]or when an Act of Parliament is against common right and reason or repugnant or impossible to be performed, the common law will controul it and adjudge such act to be void."[17]

Of the revolutionary conventions, by far the most important and the one with more influence on our history was the Virginia convention of 1776 held in Williamsburg, which was the fifth and last of the Virginia colonial conventions originally convened to fill the governmental gap caused by Lord Dunmore's dissolution of the House of Burgesses.[18] The convention named a committee to prepare a Declaration of Rights and a Constitution. Among the members of the committee were George Mason, the author of the Virginia Declaration of Rights, and James Madison, the author of the federal Bill of Rights. The Virginia Declaration of Rights was the first true Bill of Rights in the modern American sense, since it is the first protection for the rights of the individual contained in a Constitution adopted by the people acting through an elected convention.[19] It is almost wholly the individual work of Mason,[20] and its importance as the source of the federal Bill of Rights may not be overemphasized. The failure of the federal Constitution to contain a Bill of Rights was a, if not the, principal contention at the Virginia ratifying convention in 1788. Patrick Henry, for example, among others, spoke passionately against ratification for this reason.[21] At that time, it must be remembered, Virginia was not only the oldest colony, she was the richest and most populous, and her territory, running from the Atlantic to the Mississippi, cut the country in half, so that a failure of Virginia to ratify the federal Constitution, although nine States had then done so, would have almost certain-

Heller, The Sixth Amendment (1951) ) traces the confrontation clause to the common law reaction against the abuses of the Raleigh trial.

14. Schwartz, The Bill of Rights, A Documentary History, 1971, pp. 170, 179, 180, 231–234. Hereinafter cited as Schwartz.

15. Schwartz, pp. 40–44, 52. Goebel, History of the Supreme Court, 1971, Vol. 1, Ch. I, esp. pp. 66, 84. Hereinafter Goebel.

16. Schwartz, pp. 232–234.

17. Schwartz, at 182; Goebel, Ch. I, esp. at 92, et seq.

18. Schwartz, pp. 231–234.

19. Schwartz, at 231.

20. Schwartz, at 231; E. Randolph, Essay on the Revolutionary History of Virginia, Ibid., at 246, et seq.; Dabney, Virginia: The New Dominion (1971), at 136. An interesting footnote to history is that Mason wrote the Virginia Declaration in his room at the Raleigh Tavern. Schwartz, at 232.

21. Elliot's Debates, Chronicle of the Virginia Convention; Schwartz, at 762, et seq., contains abstracts from many of the speeches.

ly meant the failure of the new government. Virginia finally ratified the new Constitution by way of compromise, that is to say, she did ratify with the reserved right to withdraw and recommended at the same time a Bill of Rights to be adopted as amendments to the new Constitution.[22] The drafting committee of the proposed federal Bill of Rights included not only Mason and Madison but also Patrick Henry, John Marshall and George Wythe.[23] Every specific guarantee in the Virginia proposal, save one, later found a place in the federal Bill of Rights which was introduced in the first Congress by Madison as proposed by Virginia herself. Among those was the right "to be confronted with the accusers and witnesses," a lineal descendant of the phrase in the Virginia Declaration.[24]

Although Schwartz notes the omission of references to English law and colonial charters in the Virginia Declaration, taking at face value its assertion of the law of nature as the source of the enumerated rights, I think it is far more likely that Mason's articulation of trial rights, which is really the basic guarantee of the Sixth Amendment, has its roots in the abuses by the Crown and is an attempt to determine that the abuses might never take place under the new government which was being established. As Mason said in a letter to Richard Henry Lee: "We are now going upon most important of all subjects— 'government!'." [25] Indeed, this statement of Mason's is rather more aligned to the conclusion of Schwartz that a con-

census had developed among Americans on the fundamental rights which the law should protect,[26] and it is consistent with Mrs. Bowen's statement as to the public reaction to Sir Walter Raleigh's defense of himself: "LAW antedated *the laws* and would exist if every man-made statute were expunged. It was a native conception, part of the common inheritance. Sir Walter had presented the law as plain citizens knew it in their minds and held it in their hearts, no matter what construction had been put upon it by legalists now or in Queen Mary Tudor's time." [27]

It is noteworthy that research on the subject of confrontation clause inevitably leads to Raleigh's trial.[27A] The trial is mentioned in many of the opinions and by the writers.[28] As noted in *Green*, at least one author traces the confrontation clause to the reaction against the abuses in Raleigh's trial. Although this notion is characterized by Mr. Justice Harlan essentially as an assertion,[29] the space devoted to the trial by Wigmore leaves no doubt as to the weighty part it played in his thinking. The trial is all the more noteworthy because Sir Edward Coke was the Attorney General who prosecuted Raleigh. While I am not certain enough of my ground to flatly advocate Heller's position that Raleigh's trial was the direct antecedent of the confrontation clause, I do not think his conclusion may be rejected out of hand.

With Raleigh's accomplishments [30] in mind, is it any wonder that the trial and

22. See abstracts from minutes of the Virginia Convention reported in Schwartz, esp. at 828–846.

23. Schwartz, at 765.

24. Schwartz, at 765; the Virginia proposed federal Bill of Rights is found at Schwartz, at 840, et seq.

25. Quoted in Schwartz, p. 232.

26. Schwartz, at 233.

27. Bowen, The Lion and the Throne, at 202.

27A. Also noteworthy here is the fact that Raleigh was tried for conspiracy. 2 How.

St. Tr. 16, 18; Jardine's Cr. Tr. I, 418–20; Churchill, The New World (1956), at 160.

28. E. g. *Green*, supra; Wigmore; Campbell, Life of Lord Chief Justice Popham, Life of Sir Edward Coke.

29. *Green*, 399 U.S. pp. 177–178, 90 S.Ct. 1930.

30. Raleigh, the youngest son of a Devonshire squire, in an age not noted for equal opportunity of employment, had risen to the highest positions of responsibility in England. He had been a member of Parliament; fought the Spanish wherever he found them and had an important part in the defeat of the Armada; sailed with Howard, Hawkins,

execution made an impression on the English people? Indeed, it has been passed down to us for almost 400 years as a horrible example. Can there be the slightest doubt that this trial was fresh in the minds of Mason and Madison, and Wythe and Marshall and Henry? And in the unlikely event the particular trial was not, can we say that the abuses exemplified by the trial were not among those which the authors of the Bill of Rights sought to correct? I think not.

It should be kept in mind that there had been many other state trials in which similar abuses had been committed by the Crown,[31] and the Supreme Court, in Mattox v. United States, 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409, has accurately expressed the purpose of the confrontation clause in language startlingly reminiscent of that used by Raleigh in his own defense:

> "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and

judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

Such purposes as are expressed in *Mattox* are bound to have been in the minds of Mason and Madison as they drafted the Virginia Declaration and the Bill of Rights.

What were Raleigh's complaints? What were the abuses of the time? What demanded correction?

First, there were not two witnesses to prove the charge, and, second, the witness did not maintain the accusation to his face.[32]

He argued: "I may be told that the statutes I before named be repealed, for I know the diversity of religion in the Princes of those days caused many changes, yet the equity and reason of those laws remains. They are kept to illustrate how the common law was then taken and ought to be expounded." [33] Raleigh had argued that the statutes of Edw. VI required two witnesses to condemn him, and had also argued that the statutes required the presence of the witness in person. The argument was unavailing. To quote Wigmore, "From the very year of the latter enactment (1554) until the end of the succeeding century, it remained by judicial con-

---

and Frobisher; campaigned with Essex; settled North Carolina; stormed Cadiz; and was the captain of the palace guard. A patron of the arts and friend of Spenser, he would, while in prison, write a scholarly History of the World. True to the custom of the time, he was forced to defend himself upon his indictment for treason without an attorney, and his prosecutor was the greatest of the common lawyers. Although convicted and later executed, history has never waivered for a moment in its verdict of Raleigh as one of, if not, the greatest of the Elizabethan Englishmen. Churchill describes his execution as a deed of shame and remarks upon his unjust trial. Churchill, The New World, 1956, esp. at 160; Irwin, That Great Lucifer (1960); W. and A. Durant, The Age of Reason Begins; Bowen, The Lion and the Throne.

31. Some mentioned in Wigmore are: The Duke of Norfolk's Trial (1571); The Earl of Stafford's Trial (1640); Archbishop Laud's Trial (1644).

32. "If then, by the statute law, by the civil law and by God's word it be required that there be two witnesses at the least, bear with me if I desire one. Prove me guilty of these things by one witness only, and I will confess the indictment. If I have done these things I deserve not to live, whether they be treasons by the law or no. Why then, I beseech you, my Lords, let Cobham be sent for. Let him be charged upon his soul, upon his allegiance to the King. And if he then maintain his accusation to my face, I will confess myself guilty." Quoted in Bowen, The Lion and the Throne, at 202–203.

33. Quoted in Bowen, The Lion and the Throne, p. 202.

struction a dead letter."[34] The courts had construed the statute of 1 & 2 P. & M., together with the statute of 5 Edw. VI, to reach a result that trials for treason would be conducted as at common law. In the words of the court, the statutes of Edw. VI "were found to be inconvenient and are therefore repealed by the 1st and 2nd of P. & M."[35]

How were the abuses corrected? The two witness rule was corrected in the Constitution itself, and in the debates on treason it is particularly noted that both Madison and Mason took part. The definition of treason, including the necessity of an overt act, based on an old statute of 25 Edw. III, was frozen into the Constitution,[36] as was the two witness rule, a source of which is obviously the English statutes of Edw. VI and P. & M., as well as the statute of I Elizabeth, c.1., § 37.[37]

Is it too farfetched to say that the remaining abuse was corrected in the Bill of Rights? Again, I think not.

The shifting sands of English politics of the time and the vagaries of the religion of the Princes, as Protestants and Roman Catholics struggled through the years for ascendency in England, had too often made prosecutions matters of state policy rather than punishment for acts of disloyalty to the Crown.

The federal Constitution had corrected a few of the abuses, and others remained, thus the Bill of Rights. And how should it be construed? Should the trial right guarantees receive any less protection because in a Bill of Rights rather than in the body of the Constitution? John Dickenson, of Delaware, demanded exactly what was meant in the old statute by requiring the testimony of two witnesses, and this was achieved.[38] Randolph in his *Essay* stated as one of the objects of the Virginia Declaration, "that in all the revolutions of time, of human opinion, and of government, a perpetual standard should be erected."[39] Was this an implausible reference to the repeal and reenactment of the old statutes from time to time according to the politics of the moment by Parliament, or by judicial construction?[40] I think not. The Bill of Rights, then, ought to represent a political judgment, that certain principles shall be timeless, "a standing ark, to which first principles can be brought on to a test."[41] While the article has been described as modes of defense for accused persons similar to those under English law,[42] no reason can be given, and it would seem unlikely, that the colonists meant to abandon the rights which had existed from time to time under the old statutes and commit themselves to the harsher doctrines of the common law.

With these principles in mind, I turn to the conclusions in the two latest cases on the subject and to Wigmore.[42A] A plurality of the court in *Green* and *Dutton* apparently feels that the confrontation clause may be satisfied in many in-

34. Wigmore, Vol. 5, at 19.

35. Wigmore, Vol. 5, at 19; § 1364 n. 42. See also from n. 42 the quotation from the prosecuting Serjeant in the Duke of Norfolk's Trial: ". . . the law was so for a time, in some cases of treason, but since the law hath been found too hard and dangerous for the Princes, and it hath since been repealed."

36. U.S. Const., Art. III, § 3; Madison's Notes of Debates in the Federal Convention of 1787 (Ohio Univ. Press 1966), at 489, et seq.; Charge to Grand Jury (C.C.S.D. N.Y. 1861) 30 Fed.Cas. 1034.

37. Wigmore, Required Number of Witnesses, 15 Harv.L.Rev. 12 (1901).

38. Bowen, Miracle at Philadelphia (1966), at 221.

39. *Essay* reprinted in part, Schwartz, p. 249.

40. Coke later, in his Third Institute, revised his opinion that the statute of 5 Edw. VI had been repealed by the statutes of Philip and Mary. 15 Harv.L.Rev. 12, 103 (1901).

41. Randolph's Essay, Schwartz, at 248.

42. Randolph's Essay, Schwartz, at 248.

42A. Wigmore's depth of case and statutory research dwarfs all other writing I have found on the subject.

stances (not including the historical exceptions) other than by an appearance of the witness before the trier of fact and there giving his testimony. It is noteworthy, as before related, that the opinions favoring admissibility yet seem to be based to some extent, although not articulated, on the denial of fundamental rights' theory of *West*, although it may be increasingly difficult to cling to this in view of the language of the court in *Pointer* that the confrontation right will be enforced against the States in the same terms as it is against the federal government. Wigmore's conclusion that confrontation is, in its main aspect, merely another term for the test of cross-examination has been rejected by the court as has, I submit, his conclusion that the Constitution does not prescribe what kinds of testimonial statements shall be given infra-judicially, this depending on the law of evidence for the time being, and that the Constitution limits only the mode of procedure to be followed, that is to say, a cross-examination procedure, and that only as is prescribed by the ordinary law of evidence.[43] Taking the two statements of Wigmore together, then, as they must be taken, and they have been adopted in large part by the majority here by its relating the admissibility of the statement solely to rules of evidence rather than giving effect to the prescribed procedure, little or nothing is left of the confrontation clause, and we have very nearly arrived at the point where the rules of evidence concerning hearsay are the same both in criminal and civil cases. I cannot conceive that the framers of the Sixth Amendment ever dreamed such a result could be attained.

In none of the Supreme Court cases do I find that the right of the accused to have his accuser testify on the witness stand in the courtroom is a secondary or subsidiary right. Rather, the rights of confrontation and cross-examination are spoken of in all the cases in the conjunctive, or as the right of cross-examination being included in the right of confrontation,[44] which seems to me to be entirely consistent with the Sixth Amendment's application only to criminal trials, leaving the development of the ordinary rules of hearsay to the courts and to the legislature. But neither the courts nor the legislature should be allowed to change the rules of hearsay so as to deprive an accused of his basic right to have the witnesses against him appear on the witness stand and there "in person before the party accused" "avow and maintain that which they have to say."

The exceptions in the old English statutes, of course, made for a witness who was dead at the time of the trial or one who was beyond the realm, might consistently be read into the clause. *Mattox* gave effect to the exception for the witness who was dead and who had testified at a previous trial. In United States v. Angell, 11 F. 34 (CC, DNH 1881), it was held that although the wit-

43. Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), held inadmissible testimony at a preliminary hearing at which accused was present but had no attorney and did not cross-examine. Witness was in a federal prison in another state at time of trial. But the court added, p. 725, 88 S. Ct. 1318, it would reach the same result if defendant had had an attorney and cross-examined the witness at the preliminary hearing. Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L.Ed.2d 923 (1965), reached the same result on slightly different facts on the ground that the confrontation clause "has [to be] held to *include* the right to cross-examine." [Italics added]. In Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 3 L.Ed. 2d 934 (1965), the court held inadmissible the statement of a co-defendant who refused to testify on the ground it might incriminate him. The court said the right of cross-examination is "a primary interest" but did not equate it to confrontation. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L. Ed.2d 1377 (1959), traced a confrontation right to Acts 25:16, long before common law hearsay was dreamed of, and reversed a denial of extension of a security clearance because of lack of "confrontation *and* cross-examination. *They* have ancient roots." [Italics added].

44. See cases n. 42. Also see Snyder v. Massachusetts, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ; Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 2d 476 (1968).

ness was out of the United States, testimony at a preliminary hearing was not admissible, although, even at Raleigh's trial, he had conceded that such evidence might have been admitted there. The right of cross-examination might very well, and probably should, be construed to determine when the historic exceptions to the confrontation clause are applicable.

To me, a reading of Wigmore's extensive, thorough and painstaking history of the hearsay rule and the cases [45] makes it clear that the right to have the accusing witness appear in person came first. Because the witness, then, was already in court, the right to cross-examine followed. And then, since the right to cross-examine the witness was established, next came the right to have an attorney to cross-examine the witness. Assuming the steps in this order are correct, and I believe they are, the entire history of the matter falls into place alongside the development of the hearsay rule, but not coextensive with it and not necessarily subject to its exceptions. Thus, development of the rules for the admissibility of hearsay takes its place in the scheme of things, unless the development admits hearsay in conflict with the Sixth Amendment. In such case, of course, the Amendment must control. Under this theory, the evidence of the witness here is not admissible because the witness did not state on the witness stand his accusatory statements. The fact that he was not subject to cross-examination is an additional reason to exclude the evidence. This analysis is consistent with the opinion of the court in that part of the opinion in *Dutton*, 400 U.S. at 82, 91 S.Ct. at 216, where it quoted *Green* to say ". . . indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception." This is also consistent with the concurring opinion of Mr. Justice Harlan in *Dutton* except where he, with Professor Wigmore, while defining the confrontation right as a "mode of procedure," then limits the mode of procedure to "a cross-examining procedure." This, I would not do. It relegates the appearance of the witness in person before the jury and there making his accusatory statements to a secondary role. Such secondary role of the personal appearance of the witness while he is testifying, as I see it, has no background either in history or in the cases.[46] As to the result, then, in both *Dutton* and *Green*, I believe that both history, and precedent, until after *Mattox*, support the dissents in their construction of the Sixth Amendment. I can find nothing after *Mattox* to support any justifiable change. It is true that, in *Dutton* and *Green*, as in all the cases which have been decided by the Supreme Court which have come through the State courts, the decisions may be justified by application of the *West* standard of denial of fundamental rights rather than by the application of the Sixth Amendment to the precise situation. But, after *Pointer*, in 1965, such justification has become increasingly difficult. We are not concerned here with due process or with the standard of denial of fundamental rights, but rather with a straightforward application of the confrontation clause in a trial in the federal courts. No reason is given to engraft hearsay exceptions onto the confrontation clause and thus confuse with the developing law of evidence what started out and remained for many years a rule of procedure.

45. Wigmore, Ch. XLV.

46. *Snyder*, n. 43, supra: "Thus, the privilege to confront one's accusers *and* cross-examine them *face to face* is assured to a defendant by the Sixth Amendment. . . ." 291 U.S. at 106, 54 S.Ct. 332. In Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911), the court construed the phrase "to meet the witness face to face" to mean substantially the same as the confrontation clause. In Barber v. Page, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968), the court said of the right of confrontation: "It includes *both* the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." [Italics added].

In partial summary, I believe the defendants here were convicted on evidence which was not taken under oath, not signed, not written by the witness, not remembered by the witness, not subject to cross-examination, and not given in the courtroom in the presence of the jury and the accused. This court, since it might entirely dispose of the case by reversing on the non-constitutional basis of *Tong's Case, Lutwak, Krulewitch,* and *Bridges,* should never reach the constitutional problem of the confrontation clause. See Alma Motor Company v. Timken Company, 329 U.S. 129, 136, 67 S.Ct. 231, 91 L.Ed. 128 (1946).

In all events, whether on the constitutional ground, although I consider the question prematurely reached, or on non-constitutional evidentiary grounds, it follows that I would reverse and remand for a new trial if the United States be so advised.