**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Paul DiCARO, Defendant-Appellant.**

No. 83–2797.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1985.

Decided Sept. 3, 1985.

Rehearing and Rehearing En Banc Denied Oct. 4, 1985.

Paul J. Larkin, Jr., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Maren J. Dougherty, Chicago, Ill., for defendant-appellant.

Before WOOD and FLAUM, Circuit Judges, and GRANT, Senior District Judge.[*]

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

FLAUM, Circuit Judge.

Defendant Paul DiCaro appeals his conviction following a jury trial on one count of engaging in racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1982),[1] and one count of interfering with interstate commerce by committing an armed robbery in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982).[2] For the reasons set forth below, we reverse the conviction on the RICO count, but affirm the conviction on the Hobbs Act count.

I.

The events leading up to DiCaro's convictions, insofar as they are relevant to our resolution of this appeal, may be briefly recounted. DiCaro was indicted under section 1962(c) of RICO based on his alleged commission of a series of seven predicate criminal acts between September 1970 and January 1978, including four actual or attempted armed robberies, two thefts, and an attempted murder. The most recent of these acts, the armed robbery of a grocery store in Chicago known as Halsted Foods Center, Inc. ("Halsted Foods") on January 19, 1978, served as both a predicate act on the RICO count and as the exclusive basis for liability on the Hobbs Act count. The RICO count charged DiCaro with conducting the affairs of an "enterprise," the enterprise being DiCaro himself, through a "pattern of racketeering activity," the pattern being the series of seven predicate acts. In essence, DiCaro was indicted and tried under RICO on the theory that he had conducted his own affairs through a pattern of racketeering activity.

DiCaro was tried jointly with co-defendant Michael Gurgone, who was charged only on the Hobbs Act count for his alleged involvement in the Halsted Foods robbery. The evidence offered by the government to prove the defendants' involvement in the Halsted Foods robbery, like that offered to prove DiCaro's participation in the other crimes, consisted principally of testimony from accomplices who had also participated in the robbery. The government's first witness was David Willis, who testified that those involved in the robbery included himself, DiCaro, Gurgone, and two others named Joe Zito and Ronald Brown. Willis testified that on the night of the robbery, he, Zito, and a woman named Luanne Walz met outside Halsted Foods and watched from Zito's car as the night janitor arrived and was locked inside the store by the manager. The three then left and drove to Walz's house, where they met Brown and picked up ski masks for Willis, Zito, and Brown. Willis, Zito, and Brown then drove back to Halsted Foods in a car that Willis and Brown had previously stolen.

Upon arriving at Halsted Foods, Willis helped Brown climb a telephone pole located next to the store, and then returned to the car where he and Zito watched the janitor working inside the store. Meanwhile, Zito communicated with Brown by walkie-talkie, and Willis listened to a police scanner. A few minutes later, Willis and Zito went to the back of the store, where Brown let them in through the back door. Once inside, Brown gave Willis a gun and told him to guard the janitor, who had been handcuffed and tied to a chair in the back room of the store. While he was watching the janitor, Willis saw Zito enter the store with two other men who were wearing masks and carrying two tanks and a hose.[3]

1. It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

2. Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to

do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

3. As Ronald Brown explained in his grand jury testimony discussed below, these tanks were acetylene tanks that were used along with a torch to open the safes.

These three men then joined Brown in the front of the store, where the store's office and safes were located. Willis then smelled something burning, and heard a "crackling, popping noise" emanating from the office. At some point thereafter, the noise stopped, and the men came into the back room where Willis was guarding the janitor. While they were in the back room, Willis heard one of the men ask Zito if Willis "was okay," and Zito said yes. The men then took their masks off. In court, Willis identified two of the men who had taken their masks off as the defendants DiCaro and Gurgone. The men thereafter went back to the front of the store, whereupon Willis heard some more crackling and popping sounds. Finally, Willis left the store with Zito and Brown, and ultimately went back to Luanne Walz's house, where they divided up the cash taken from the store.

As corroboration for Willis's testimony, the government sought to call as a witness Ronald Brown, who had twice before implicated DiCaro and Gurgone in the Halsted Foods robbery in sworn testimony before federal grand juries. In a voir dire conducted in the jury's absence, however, Brown stated his intention to invoke the Fifth Amendment with respect to the Halsted Foods robbery and several other crimes. At the government's request, the court then issued an order granting Brown use immunity for his testimony, and also appointed an attorney to advise Brown concerning his obligations under the order. After consulting with Brown, appointed counsel reported to the court that Brown claimed a lack of memory and that he still planned not to testify notwithstanding the immunity order. The court therefore held another voir dire, wherein Brown testified to a lack of memory concerning the events underlying his prior grand jury testimony. Brown also stated that as he was testifying he was under the influence of valium, and that he had been given three doses of valium per day while being housed during the trial at the Metropolitan Correctional Center ("M.C.C."). At the conclusion of this voir dire, the court requested that the

government obtain the records of Brown's medical treatment at the M.C.C.

During the next day of trial, the court conducted a final voir dire of Brown, during which Brown testified that he suffered from amnesia as to anything that occurred prior to March 29, 1983. Brown stated that on that date he was arrested at a laundromat by police officers who pointed six shotguns and a pistol at his head and threatened to kill him. The court questioned Brown about a medical report indicating that on May 5, 1983, he told a doctor at the M.C.C. about a gunshot wound that Brown had suffered in 1973. Brown admitted that he had told a doctor that he was shot but testified that he could not remember when he was shot. After this voir dire, the court found from its questioning and observation of Brown that he had falsely claimed amnesia.

Based on this finding, the court concluded, over the vigorous objections of defense counsel, that the government could introduce Brown's prior grand jury testimony as part of its case-in-chief. The court reasoned that Brown's feigned lack of memory concerning the incidents that he had previously described to the grand jury was inconsistent with his prior testimony recounting these incidents, and thus that his grand jury testimony was admissible substantively as a prior inconsistent statement under Rule 801(d)(1)(A) of the Federal Rules of Evidence.

Before Brown's prior testimony was introduced, however, he was called to the stand and questioned by both the government and the defense in front of the jury. The government initially laid a foundation for introducing the grand jury testimony by conducting a direct examination of Brown in which he answered "I don't remember" to each of the prosecutor's questions about both the grand jury testimony itself and the underlying events recounted therein. Defense counsel also conducted a cross-examination of Brown, during which he testified among other things that the incident on March 29 had so upset him as to cause him to suffer amnesia, that he had

been threatened by federal government agents, and that he remembered previously participating in the Federal Witness Protection Program.

The judge then read to the jury certain portions of the transcripts of Brown's testimony before federal grand juries on September 12, 1979, and September 22, 1982. In this testimony, Brown had offered a description of the Halsted Foods robbery that closely resembled Willis's description in his testimony at trial, although Brown had added some additional details that Willis might not have been in a position to observe. According to Brown's testimony, he entered Halsted Foods on the night of the robbery by cutting a hole in the roof and then dropping down inside the store. Brown then handcuffed the janitor in the store and put something over his head so he could not see. Brown stated that Willis's job during the robbery was to watch the janitor, while DiCaro's and Gurgone's job was to open the store's safe. The safes were opened with the use of torches and acetylene tanks that Brown, DiCaro, and Gurgone brought into the store. Finally, Brown testified that the robbery lasted about six to seven hours and netted about $3,000, which was later divided among the participants at Luanne Walz's house.

In addition to the Halsted Foods robbery, Brown implicated DiCaro in the armed robbery of a record company and the attempted armed robbery of a jewelry store. Brown also testified before the grand jury in 1982 concerning one of the crimes that DiCaro was charged with as a predicate act under the RICO count: the attempted shooting murder of Brown in June 1973. Brown did not implicate DiCaro in the crime, however, but rather named only Richard Mara and Anthony Gallichio as responsible for shooting him. At trial below, Mara testified for the government that DiCaro had ordered and planned the murder because he feared that Brown was cooperating with the police.

After the judge completed the reading of Brown's grand jury testimony, the judge permitted defense counsel to impeach Brown by reading from his testimony in unrelated hearings before a Cook County Circuit Court judge in September 1982 and a United States District Court judge in December 1980 and August 1981. In this testimony, Brown made a number of seriously impeaching admissions. Brown generally admitted to being a lifelong burglar who had committed as many as fifty crimes that were not listed on his rap sheet as of August 1981. Brown also testified about his role as a confidential informant who provided tips to the government in return for money. Beginning in 1978, for example, Brown stated that on numerous occasions he gave "bogus" information to an F.B.I. agent in return for $10 payments, and that he did so in order to conceal his own criminal activities. Brown said that he entered the Federal Witness Protection Program in 1979 and that as a part of this program he received a total of $20,000 from the federal government over a three-year period ending in 1982.

Beyond the cash payments, Brown also testified that as a result of his cooperation with the government he was not prosecuted for numerous crimes. Rather than having defense counsel read Brown's testimony on this point, the government stipulated before the jury below that Brown was not prosecuted for fifteen separate burglaries in exchange for his cooperation with the state and federal government. On the ultimate point of his character for truthfulness, Brown testified several times that prior to 1979, when he claimed that he was "reborn," he would have lied to help himself. Moreover, when he was asked in 1981 whether he would lie to help himself then, he replied, "I probably would."

The trial testimony of Willis and the grand jury testimony of Brown were the only evidence directly connecting DiCaro and Gurgone with the Halsted Foods robbery. The bulk of the government's case consisted of testimony concerning DiCaro's involvement in the other predicate acts charged under the RICO count. After the government rested, DiCaro's counsel called as witnesses only Anthony Gallichio, who

testified that DiCaro was not involved in either the attempted murder of Brown or in the two thefts listed as predicate acts on the RICO count, and DiCaro himself, who denied involvement in any of the criminal acts that he was charged with.

The jury returned guilty verdicts against DiCaro on both the RICO and the Hobbs Act counts, but returned a not guilty verdict for Gurgone on the Hobbs Act count. The judge sentenced DiCaro to ten years imprisonment on the Hobbs Act count and five years probation on the RICO count to begin after his release from confinement.

On appeal, DiCaro presents separate arguments for reversing each of the two convictions. With respect to the RICO conviction, DiCaro contends that he could not be properly convicted as both the defendant and the enterprise under section 1962(c) of RICO, and that the evidence was insufficient to prove either that he committed the predicate acts charged or that these acts constituted a discernible "pattern of racketeering" under RICO. As to the Hobbs Act count, DiCaro argues that the court's admission of Brown's prior grand jury testimony violated both the Federal Rules of Evidence and his Sixth Amendment right to confrontation, that the evidence was insufficient to prove his participation in the Halsted Foods robbery, and that the jury's verdict against him on this count is fatally inconsistent with the jury's verdict of acquittal as to Gurgone. We shall consider DiCaro's challenges to each of the convictions in turn.

## II.

We need consider only one of DiCaro's arguments for reversal on the RICO count, as we find it to be dispositive. Under the rule announced by this circuit in *Haroco, Inc. v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 400 (7th Cir.1984), *aff'd on other grounds*, — U.S. —, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), a defendant cannot be convicted under section 1962(c) as both the "person" and the "enterprise" that had its affairs conducted through a pattern of racketeer-

ing activity. Since DiCaro was charged and convicted on the RICO count on precisely this basis, his conviction must be reversed.

Based on our analysis of both the statutory language and the underlying policies of section 1962(c), we held in *Haroco* that an individual corporation could not be held liable as a "person" that conducted its own affairs through a pattern of racketeering activity under that section. *Id.* We began by noting that the terms "person" and "enterprise" are both defined in section 1961 of RICO to include "any corporation," *id.*, just as both are defined to include "any individual." Nevertheless, section 1962(c) provides that the person who is charged with conducting the enterprise's affairs through a pattern of racketeering activity must also be "employed by or associated with" the enterprise. *Id.* Thus, if we construed section 1962(c) to permit the same entity to be both the person and the enterprise, we would reach the anomalous result that the entity was employed by or associated with itself. After considering the language of section 1962(c), we therefore concluded that Congress did not intend to allow the same entity to be both the person and the enterprise under section 1962(c). *Id.*

As to the policy considerations underlying the section, we noted that other courts had expressed concern that our interpretation might allow a corporation that constituted the "central figure in a criminal scheme" to escape liability, while subjecting only the corporation's individual employees or associates to RICO's severe sanctions. *Id.* at 401. In response to this argument, however, we pointed out the availability of section 1962(a) of RICO for reaching the corporate enterprise that is also a main perpetrator of the criminal scheme. *Id.* at 402. We explained that:

As we parse subsection (a), a "person" (such as a corporation-enterprise) acts unlawfully if it receives income derived directly or indirectly from a pattern of racketeering activity in which the person has participated as a principal within the

meaning of 18 U.S.C. § 2, and if the person uses the income in the establishment or *operation* of an enterprise affecting commerce. Subsection (a) does not contain any of the language in subsection (c) which suggests that the liable person and the enterprise must be separate. Under subsection (a), therefore, the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations.

*Id.*

We recently reaffirmed this interpretation of section 1962(c) in *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985). In *McCullough,* we held that the defendant-proprietor of a sole proprietorship could be held liable under section 1962(c) on the theory that he conducted the affairs of the proprietorship through a pattern of racketeering activity. *Id.* at 143. We emphasized, however, that the sole proprietorship at issue in *McCullough* was a business with an identity distinct and separate from that of the defendant himself. *Id.* at 144. The defendant "had several people working for him; this made his company an enterprise, and not just a one-man band." *Id.* "[I]f the sole proprietorship were strictly a one-man show," on the other hand, we noted that *Haroco* would preclude liability for the defendant under section 1962(c). *Id.*

Our holding in *Haroco* governs the present case. The government's sole argument to the contrary is based on the fact that *Haroco* involved a corporate rather than an individual defendant. This, however, is a distinction without a difference: the statutory and policy analysis of section 1962(c) contained in *Haroco* applies equally to individual as well as corporate defendants. Indeed, we essentially concluded that the *Haroco* analysis applies to individ-

ual defendants by stating in *McCullough* that the defendant could not be held liable under section 1962(c) if his sole proprietorship were merely a "one-man show." *Id.* Moreover, in terms of the statutory language of the section, it is no less incongruous to find that an individual person can be employed by or associated with himself than it is to find that a corporation can do likewise with itself. Finally, if the liable "person" and the "enterprise" can be the same entity under section 1962(a), an individual defendant, like a corporation, can likewise be charged under that section as a "person" who used income derived from a pattern of racketeering activity in the operation of an "enterprise" (himself).

The government does not argue, nor could it argue, that we may affirm DiCaro's conviction on the basis that he was employed by or associated with a criminal enterprise that possessed an identity separate from him as an individual. The RICO indictment charged that DiCaro himself was the enterprise, and the jury was instructed in accordance with this theory. *See United States v. Medina,* 755 F.2d 1269, 1279 (7th Cir.1985) ("We are unwilling to uphold [defendant's] conviction on a theory that was not argued to the jury and on which it was not instructed."). DiCaro's conviction on the RICO count must therefore be reversed.

## III.

Of DiCaro's several arguments for reversing his Hobbs Act conviction, clearly the most serious is his argument that the admission of Brown's grand jury testimony violated the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment.[4] As the govern-

---

**4.** At oral argument before this court, counsel for DiCaro contended that reversal of the RICO conviction in this case should itself mandate reversal and remand of the Hobbs Act conviction on the ground that the evidence introduced on the former count prejudiced the jury's consideration of the second count. It is well-settled law, however, that the reversal on appeal of a conviction on one count does not automatically compel reversal of a conviction on another

count that is independently supported by sufficient evidence. *See, e.g., United States v. Shue,* 766 F.2d 1122, 1133–34 (7th Cir.1985); *United States v. Valenzuela,* 596 F.2d 824, 829 (9th Cir.), *cert. denied,* 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979); *United States v. Brown,* 583 F.2d 659, 669 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217 59 L.Ed.2d 456 (1979); 1 C. Wright, *Federal Practice and Procedure* § 144, at 520 (1982). Rather, the proper focus of our

ment conceded in oral argument, the propriety of admitting such testimony under the circumstances presented here—where the witness, although present and testifying at trial, claimed no recollection of either the underlying events described in his prior testimony or the giving of the testimony itself—is a question of first impression in this circuit. We will therefore proceed to consider first, whether the admission of Brown's testimony was appropriate under the Federal Rules of Evidence, and second, whether the admission violated DiCaro's right of confrontation under the Sixth Amendment.

### A. Rule 801(d)(1)(A)

■ The court below held that Brown's grand jury testimony was admissible under Rule 801(d)(1)(A) of the Federal Rules of Evidence. That Rule provides that "[a] statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition...." Since prior inconsistent statements that come within this Rule are defined as not being hearsay, they may be admitted as substantive evidence for the truth of the matter asserted, and not merely for impeachment purposes. *United States v. Williams*, 737 F.2d 594, 608 (7th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1985).

In *Williams*, this court recently upheld the admission of a government witness's prior grand jury testimony under Rule 801(d)(1)(A) where the witness claimed a partial loss of memory in his testimony at trial. *Id.* In his prior grand jury testimony, the witness had given a description of a particular conversation that was incriminating to the defendants, but in his testimony at trial the witness's recollection of the conversation "was limited, vague, and not inculpatory." *Id.* The defendant's primary contention in *Williams* was that the witness's testimony at trial was not inconsistent with his grand jury testimony. *Id.* at 607. We rejected this contention, however, stating that "we do not read the word 'inconsistent' in Rule 801(d)(1)(A) to include only statements diametrically opposed or logically incompatible." *Id.* at 608. Rather, we joined a number of other circuits in concluding that "[p]articularly in a case of manifest reluctance to testify ... 'if a witness has testified to [certain] facts before a grand jury and forgets ... them at trial, his grand jury testimony ... falls squarely within Rule 801(d)(1)(A).'" *Id.* (quoting *United States v. Marchand*, 564 F.2d 983, 999 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978)). *See, e.g., United States v. Russell*, 712 F.2d 1256, 1258 (8th Cir.1983); *United States v. Murphy*, 696 F.2d 282, 284 (4th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1303 (1983); *United States v. Distler*, 671 F.2d 954, 958 (6th

inquiry is whether the two counts were properly joined originally under Rule 8(a) of the Federal Rules of Criminal Procedure, and if so, whether the counts should ultimately have been severed because joinder would create prejudice to the government or the defendant under Rule 14 of the Federal Rules of Criminal Procedure. *See United States v. Shue*, 766 F.2d at 1134–35.

The joinder of the RICO and the Hobbs Act counts was plainly proper under Rule 8(a). *See United States v. Gorny*, 732 F.2d 597, 603 (7th Cir.1984) (joinder of RICO count with counts based on predicate offenses constituting the pattern of racketeering under RICO count generally proper); Fed.R.Crim.P. 8(a) (joinder of two offenses proper where offenses based on "two or more acts or transactions connected together or constituting parts of a common scheme or

plan"). As to whether the counts should have been severed because of the potential for prejudice under Rule 14, we have observed that this question is addressed to the discretion of the district court, and that we will reverse a conviction on this ground "only upon a showing of clear abuse of that discretion." *United States v. Shue*, 766 F.2d at 1135 (quoting *United States v. Hedman*, 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981)). The trial court below exercised its discretion by denying DiCaro's pretrial motion to sever the RICO and the Hobbs Act counts under Rule 14, and adequately instructed the jury at trial concerning its duty to consider each of the counts separately, *see United States v. Shue*, 766 F.2d at 1135. On this record, we find no abuse of discretion.

Cir.1981); *United States v. Rogers*, 549 F.2d 490, 495–96 (8th Cir.1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977).

As support for the proposition that a claimed lack of recollection should be deemed sufficient to satisfy the inconsistency requirement of Rule 801(d)(1)(A), we cited language from the advisory committee note indicating that the Rule "will provide a party with desirable protection against the 'turncoat' witness who changes his story on the stand and deprives the party calling him of evidence essential to his case." *Williams*, 737 F.2d at 609 (quoting Fed.R.Evid. 801(d)(1)(A) advisory committee note). In order for the Rule to provide such protection in practical terms, a professed memory lapse by a witness often must be considered as inconsistent testimony. Thus, although we made no express finding in *Williams* that the witness's claimed memory lapse was false, we did observe that "[i]n light of the fact that [the witness] spoke with defense counsel seven or eight times after testifying before the grand jury but never with the government ... we have little doubt that the latter rationale [stated in the advisory committee note] fully applied in this case." *Id.*

Our underlying concern in *Williams* that a recalcitrant witness might defraud both the parties and the court by feigning a lack of memory applies with equal, if not greater, force in the present case. Here, the trial judge explicitly found, based on his questioning and observation of Brown, that he was lying when he professed to suffer from amnesia. Our review of the record—including the medical report from the M.C.C. showing that over a month after he supposedly developed amnesia Brown had recalled being shot back in 1973—convinces us that the trial judge was very likely correct. In this situation, we clearly cannot characterize the trial judge's finding that Brown's testimony at trial was inconsistent with his prior grand jury testimony as an "abuse of discretion." *See Williams*, 737 F.2d at 608 ("In view of the multitude of factors, a district court's ruling under 801(d)(1)(A) will be disturbed only if an

abuse of discretion [occurred]."). Instead, this case calls forth Wigmore's perceptive observation that a trial court must have discretion to admit a witness's prior statement as inconsistent with the witness's purported lack of memory at trial, because "the unwilling witness often takes refuge in a failure to remember, and the astute liar is sometimes impregnable unless his flank can be exposed to an attack of this sort." 3A J. Wigmore, *Evidence* § 1043, at 1061 (Chadbourn rev. ed. 1970).

The apparent necessity for the admission of a prior inconsistent statement, however, is not in itself sufficient to satisfy Rule 801(d)(1)(A). In order to distinguish those statements embraced by the Rule from garden variety, presumptively unreliable hearsay, the Rule provides that to be admissible (1) the prior inconsistent statement must have been given under oath subject to the penalty of perjury at a trial or other proceeding, and (2) the declarant who made the prior statement must both testify and be subject to cross-examination concerning the statement at the trial where the statement is sought to be introduced. Grand jury testimony undoubtedly satisfies the first requirement: the report of the House Conference Committee accompanying the Rule expressly states that "[t]he rule as adopted covers statements before a grand jury." H.R.Conf.Rep. No. 1597, 93d Cong., 2d Sess. 10, *reprinted in* 1974 U.S. Code Cong. & Ad.News 7051, 7105. Brown's prior testimony also meets the second requirement insofar as he testified at trial. The difficult issue presented by this case is whether Brown was subject to cross-examination concerning the prior testimony.

Brown's professed amnesia concerning the subject matter of his grand jury testimony, DiCaro's participation in the Halsted Foods robbery, does not alone render him not subject to cross-examination under the Rule. We so held implicitly in *Williams* by upholding the admission of the witness's prior testimony about the incriminating conversation notwithstanding his memory lapse as to that conversation in his testimony at trial. 737 F.2d at 608. Other courts

and commentators have generally agreed that a gap in the witness's recollection concerning the content of the prior statement does not preclude admission of the statement under the Rule. *See, e.g., United States v. Russell,* 712 F.2d at 1258; *United States v. Murphy,* 696 F.2d at 284; 4 D. Louisell & C. Mueller, *Federal Evidence* § 419, at 179–80 (1980). *Contra* Graham, *The Confrontation Clause, the Hearsay Rule, and the Forgetful Witness,* 56 Tex. L.Rev. 151, 161–62 (1978).

Unlike *Williams* and every other case we have found applying Rule 801(d)(1)(A) to grand jury testimony, however, Brown also claimed no memory of giving the testimony or of the circumstances surrounding his giving of the testimony. DiCaro argues that this complete absence of recollection effectively rendered Brown not subject to cross-examination concerning his prior statements to the grand jury. The government, on the other hand, argues that the present case is not materially different from *Williams* or the other cases involving a claimed lack of memory only as to the subject matter of the prior statement. While we cannot accept the government's broad contention, and must agree with DiCaro that a witness's total amnesia concerning a prior statement will often make him not subject to cross-examination, we ultimately conclude that under the very unique circumstances presented by this case, the witness was meaningfully subject to cross-examination under Rule 801(d)(1)(A).

Beginning with a consideration of the language and legislative history of the Rule, we note that the Rule requires the defendant to be subject at trial to cross-examination *concerning the statement.* Thus, it is not enough that the declarant is subject to cross-examination in some general sense: he must be subject to questioning that in some way relates to the prior statement itself. Furthermore, the legislative history suggests that this cross-examination requirement played an important role in the adoption of the Rule. *See United States v. Distler,* 671 F.2d at 958–59 (reviewing legislative history of Rule); 4 D. Louisell & C. Mueller, *Federal Evidence* § 419, at 179 ("both the Advisory Committee and Congress relied heavily upon this requirement as the principal justification for according substantive effect to prior inconsistent statements"). As the Senate Judiciary Committee stated in a report rejecting the House of Representatives' addition of a requirement that the prior statement must have been cross-examinable at the time it was originally made, a requirement that was deleted in the Rule as ultimately adopted, "the requirement ... appears unnecessary since this rule comes into play only when the witness testifies in the present trial ... and can explain an earlier position and be cross-examined as to both." S.Rep. No. 1277, 93d Cong., 2d Sess. 15–16, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7051, 7062.

In light of the significance attached to the cross-examination requirement, we must be careful to avoid a construction that would render the requirement effectively meaningless. We thus recognize, as have those commentators who have considered the particular question, that in many or perhaps most cases in which the witness suffers a total memory lapse concerning both the prior statement and its contents, the witness cannot be considered subject to cross-examination concerning the statement under the Rule. *See* 4 *Weinstein's Evidence* ¶ 801(d)(1)(A)[07], at 801–132 (1984); 4 D. Louisell & C. Mueller, *Federal Evidence* § 419, at 180–81. As one treatise has persuasively argued, "Rule 801(d)(1)(A)'s cross-examination requirement should not be viewed as an empty formalism which can be satisfied by the mere fact that the witness is present and can be required to sit still long enough for questions to be put." 4 D. Louisell & C. Mueller, *Federal Evidence* § 419, at 181.

Just as we must avoid interpreting the cross-examination requirement formalistically so as to admit prior statements by witnesses who in effect are not cross-examinable at trial concerning their statements, so we must avoid interpreting it so as to exclude statements by witnesses who in

effect *are* cross-examinable at trial concerning their statements. *See* D. Louisell & C. Mueller, *Federal Evidence* § 419, at 182 (whether requirement satisfied should depend in part on "the extent to which the actual responses of the witness, whether framed as denials of the prior statement, claims of lack of memory, or refusals to answer, shed light upon ... circumstances and motives" underlying prior statement). We believe that notwithstanding his feigned lack of memory, Brown was subject to cross-examination concerning his grand jury testimony at trial.[5]

First, Brown took the stand and was actually questioned extensively by both the prosecution and the defense. Although a portion of this questioning consisted of Brown simply answering "I don't remember" to various questions about events that occurred prior to March 1983, some of the questioning proved more revealing. For instance, at one point when he was being cross-examined by defense counsel for Gurgone, Brown stated that he did remember being a member of the Federal Witness Protection Program. Brown's admission at trial to his earlier participation in the Program became important in light of the prior testimony that Brown had given at federal and state court hearings, which was later read by defense counsel to the jury. In this prior testimony, Brown stated that he had been in the Witness Protection Program between 1979 and 1982, around the same time that he had given the grand jury testimony inculpating DiCaro, and as a

member of the Program had received substantial payments from the federal government. Thus, the cross-examination of Brown enabled the defense to create a reasonable basis for the jury to conclude that Brown's statements in his grand jury testimony were tainted by a desire to please the government.

We also cannot ignore the likely impact that the parties' questioning of Brown concerning his claimed memory lapse had on the jury's perception of his credibility. If the trial judge's finding is any indication, Brown must have appeared less than fully believable when he testified on the stand that he suffered from amnesia.[6] In any event, the jury was able to draw its own inferences about Brown's credibility as he responded to questioning before them. As Judge Learned Hand so eloquently stated in an early case upholding the admissibility of prior inconsistent statements of a witness:

> The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court.

*DiCarlo v. United States,* 6 F.2d 364, 368 (2d Cir.), *cert. denied,* 268 U.S. 706, 45

---

**5.** We note initially that one of the reasons that typically would necessitate cross-examination of a witness at trial concerning his out-of-court statement is not present in this case. Since there is no dispute about the authenticity of the transcript of Brown's grand jury testimony, there is thus no need for questioning to determine whether the prior statement was actually made as reported in court. *See United States v. Boulahanis,* 677 F.2d 586, 589 (7th Cir.) (no need for cross-examination where transcript of out-of-court statement of deceased declarant admitted and its accuracy not challenged), *cert. denied,* 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982).

**6.** Although our inability to view Brown's demeanor first-hand precludes us from drawing any firm conclusions concerning his credibility,

we do note that even a reading of the transcript of Brown's testimony before the jury leads us to doubt whether Brown was very believable in claiming to lack recollection. For example, when one of the prosecutors during a re-direct examination asked Brown whether he "recall[ed] testifying a few minutes ago" about a particular matter, he replied: "I don't remember none of it. I don't remember nothing. That's all there is. I got nothing left. Leave me alone." Despite further efforts by the prosecutor, and even the trial judge, to get Brown to answer this question, he continued to profess a failure to remember his testimony earlier that day. An exchange such as this would probably lead the jury to believe that Brown was being uncooperative rather than forgetful.

S.Ct. 640, 69 L.Ed. 1168 (1925). *See also California v. Green*, 399 U.S. 149, 160, 90 S.Ct. 1930, 1936, 26 L.Ed.2d 489 (1970) (when witness gives inconsistent statement, "[t]he jury is alerted by the inconsistency in the stories, and its attention is sharply focused on determining either that one of the stories reflects the truth or that the witness who has apparently lied once, is simply too lacking in credibility to warrant its believing either story"). While the cross-examination of Brown regarding his claim of amnesia might not be characterized as "concerning" his prior statements before the grand jury in the most direct sense, his credibility in making this claim would doubtlessly affect the jury's willingness to believe his prior statements and thus make him in one meaningful sense subject to cross-examination concerning those statements.

Second, defense counsel was able to impeach Brown's credibility severely with numerous statements that he had made in prior federal and state court hearings. As described above, Brown admitted in these hearings to being a life-long burglar who had committed countless crimes, who had taken substantial sums of money from the government even while he was involved in continuing criminal activities, and who by cooperating with the government had avoided prosecution for several crimes he had committed. This is hardly the profile of a credible witness. In addition, Brown's statements related directly to the time period during which he had given the grand jury testimony incriminating DiCaro. For example, Brown admitted to being in the Federal Witness Protection Program and receiving $20,000 from the federal government between 1979 and 1982, while the incriminating grand jury testimony was given in September 1979 and September 1982. Brown also stated at a hearing held in 1981 that even then he would probably tell a lie in order to help himself. Thus, by reading these prior statements of Brown's to the jury, the defense was able to provide a substantial, if not compelling, basis for the jury to believe that Brown might have been lying in order to help himself when he implicated DiCaro in his grand jury testimony.

In sum, defense counsel in this case could hardly have hoped for a more powerful impeachment of Brown than that which they achieved through his testimony at trial and the introduction of his prior statements. It would therefore be the height of formalism for us to conclude that the admission of Brown's grand jury testimony under these circumstances was improper because he was not subject to cross-examination concerning the testimony. While we would not necessarily hold that, standing alone, Brown's testimony at trial or the reading of his prior statements would be adequate to allow the admission of his grand jury testimony under Rule 801(d)(1)(A), the combination of these two elements in this case leads us to conclude that the admission was proper.

## B. Confrontation Clause

■ DiCaro contends that the admission of Brown's grand jury testimony also violated the Confrontation Clause of the Sixth Amendment for the same reason that it supposedly violated Rule 801(d)(1)(A): that Brown's purported memory lapse at trial deprived defense counsel of a meaningful opportunity to cross-examine him. Our resolution of DiCaro's constitutional claim thus turns on basically the same factors as our analysis under Rule 801(d)(1)(A). We nevertheless consider this constitutional claim separately because while "[i]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots ... [the Supreme] Court has never equated the two...." *Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970) (plurality opinion). *See Ohio v. Roberts*, 448 U.S. 56, 62–66, 100 S.Ct. 2531, 2537–39, 65 L.Ed.2d 597 (1980); *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970); *Mattes v. Gagnon*, 700 F.2d 1096, 1101 (7th Cir.1983); *United States v. Rogers*, 549 F.2d 490, 498–99 (8th Cir.1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977).

This court has recently considered Confrontation Clause challenges in two cases that, while somewhat factually distinguishable, provide important general principles to guide our analysis in deciding whether a witness's forgetfulness at trial concerning his earlier statement precludes the admission of the statement under the Sixth Amendment. *See United States v. Baker,* 722 F.2d 343, 347–49 (7th Cir.1983), *cert. denied,* —— U.S. —— 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984); *Vogel v. Percy,* 691 F.2d 843 (7th Cir.1982). In *Baker,* the witness at trial testified in some detail about the involvement of a person whom she knew as "Blue" in the check-stealing scheme for which the defendant was being prosecuted, but failed to make an in-court identification of the defendant as being that person. *Baker,* 722 F.2d at 345. The government then questioned the witness concerning a prior interrogation session with federal government agents in which she had picked out two photographs of the defendant from a photo spread and identified them as being photographs of the person she knew as "Blue." *Id.* In her testimony at trial, the witness remembered the interrogation session, and that she had picked out two photographs from a photo spread, but claimed to have forgotten what she told the agents about the two photographs. *Id.* The trial court then allowed one of the federal agents to testify that the witness had stated earlier that these two photographs were of the person known to her as "Blue."

In considering the defendant's claim that the admission of the witness's prior statement violated the Sixth Amendment, we began by stating that "[i]t is well-settled law that 'the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.'" *Id.* at 347 (quoting *California v. Green,* 399 U.S. at 158, 90 S.Ct. at 935). We further observed, however, that the Supreme Court had not yet decided "whether a witness's apparent memory lapse can so hamper cross-examination as to make use of the

witness's out-of-court statement a violation of the confrontation clause." *Id.* at 347–48. Noting that courts in several circuits had spoken to this question in varying factual contexts, we concluded that:

> The result in each of these cases has turned largely on *the degree to which the declarant's memory lapse affected the jury's ability to determine the veracity of the out-of-court statement.* We believe this to be the proper focus of our inquiry here.

*Id.* at 348 (emphasis added). *See also California v. Green,* 399 U.S. at 160–61, 90 S.Ct. at 1936 (while cross-examination of declarant when statement first made might put jury in better position to evaluate truth of statement, "the question as we see it must be not whether one can somehow imagine the jury in a 'better position,' but whether subsequent cross-examination at the defendant's trial will still afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement"); *United States v. Infelice,* 506 F.2d 1358, 1363 (7th Cir.1974) (although witness suffered memory lapse at trial, defendant "was not deprived of the right to test the knowledgeability and credibility of [the witness], and thus he was not deprived of his sixth amendment rights"), *cert. denied,* 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 802 (1975).

In applying this standard to the facts presented in *Baker,* we drew heavily upon our earlier decision in a habeas case raising similar issues, *Vogel v. Percy,* 691 F.2d at 843. In *Vogel,* we upheld over a Confrontation Clause challenge the admission of a witness's prior statement to the police implicating the defendant in a robbery on the grounds that: (1) the witness's memory lapse as to the giving of the statement was "so selective as to be incredible," since he remembered all of the relevant events surrounding the robbery that occurred just hours before, and (2) the petitioner had an adequate opportunity to cross-examine the witness concerning the circumstances surrounding his interrogation and statement to the police. *Id.* at 846. We likewise

concluded in *Baker* that the witness's professed inability to remember identifying the photographs as being of the defendant was "so selective as to be incredible," in light of her otherwise complete memory of the interrogation session, including her viewing and selection of the photographs. 722 F.2d at 348–49. We further stated that defense counsel in *Baker* similarly had sufficient opportunity to cross-examine the witness about the circumstances surrounding the interrogation session. *Id.* at 349. In sum, we held "that because [the witness] was willing to testify to the facts underlying her earlier out-of-court statement, the jury had a satisfactory basis for evaluating that statement, and the confrontation clause was not violated." *Id.* In a footnote accompanying our conclusion, however, we emphasized that our holding was narrowly limited to its facts, stating: "We express no view on whether [the witness's] prior statement would have been admissible had her memory lapse been more complete or more believable." *Id.* n. 13.

Compared to the witness's testimony in *Baker* and *Vogel,* Brown's memory lapse at trial concerning both the making and the subject matter of his prior statements was clearly more complete, although probably not more believable. On its facts, the present case is much closer to *United States v. Payne,* 492 F.2d 449, 450–54 (4th Cir.), *cert. denied,* 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 116 (1974), a case that we cited approvingly in *Baker* as speaking to the question of whether a witness's memory lapse can so hamper cross-examination as to make admission of the witness's prior statements a violation of the Sixth Amendment. *Baker,* 722 F.2d at 348. In *Payne,* the Fourth Circuit upheld under the Confrontation Clause the admission of a witness's prior written statement to a federal agent in which the witness implicated the defendants in a counterfeiting conspiracy, when the witness at trial claimed to have forgotten both the giving of the statement and the facts contained within the statement. 492 F.2d at 450. The court reasoned that despite defense counsel's inability to question the witness about the facts contained in the statement, the witness

> was available for cross-examination about other events contemporaneous with the period of the alleged conspiracy; he could have been cross-examined about possible bias or prejudice ... and he could have been interrogated by the government about why he failed to recollect what he had previously said and what pressures, if any, had been exerted upon him ... to encourage his failure of recollection of events.... The jury would thus have had a substantial basis on which to determine the truthfulness of [the witness's] previous statement and full opportunity to observe [the witness's] demeanor and manner of testifying so that it could make a determination of whether there was a genuine failure of recollection and its significance on the persuasiveness of his earlier statement.

*Id.* at 454.

Except for the fact that Brown's claim of amnesia concerning anything that occurred prior to March 1983 did not give defense counsel quite the same latitude to question Brown on the stand about other events contemporaneous with his grand jury testimony, the Fourth Circuit's analysis in *Payne* applies equally to the present case. As we explained previously in concluding that Brown was subject to cross-examination concerning his statements for purposes of Rule 801(d)(1)(A), Brown was questioned extensively on the stand concerning both his claim of amnesia and other matters relevant to the credibility of his prior grand jury testimony, and he was thoroughly impeached by the introduction of numerous statements he had made at other judicial hearings relating to the time period surrounding his grand jury testimony. We therefore hold that while Brown's claimed memory lapse was more complete than that of the witnesses in *Baker* and *Vogel,* this lapse nonetheless did not so negatively affect "the jury's ability to determine the veracity of the out-of-court statement," *Baker,* 722 F.2d at 348, that it rendered the admission of Brown's grand

jury testimony a violation of the Confrontation Clause. Rather, we are confident that in the unique situation presented here, the jury had ample information from which it could assess the truth of Brown's grand jury testimony.[7]

### IV.

■ DiCaro's remaining arguments for reversing his Hobbs Act conviction merit only a very brief discussion. His challenge to the sufficiency of the evidence to prove his involvement in the Halsted Foods robbery rests mainly on the premise that Brown's grand jury testimony and Willis's trial testimony lacked credibility in various respects. This is not a sufficient premise for reversing DiCaro's conviction, however, because the weighing of credibility is generally the duty of the jury, not of this court. *See United States v. Bailey*, 444 U.S. 394, 414–15, 100 S.Ct. 624, 636–37, 62

L.Ed.2d 575 (1980); *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). If believed, Willis's trial testimony describing the robbery and his in-court identification of DiCaro as one of the men involved,[8] along with Brown's grand jury testimony, were adequate to persuade a rational jury of DiCaro's guilt beyond a reasonable doubt. *See United States v. Mayo*, 721 F.2d 1084, 1087 (7th Cir.1983) ("we will affirm the trial court unless the evidence, viewed in the light most favorable to the Government, could not have persuaded any rational trier of fact of defendant's guilt beyond a reasonable doubt"); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (same), *cert. denied*, —— U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984).

■ Lastly, the fact that the jury acquitted Gurgone while convicting DiCaro on

---

7. The cases that DiCaro relies upon to establish a Sixth Amendment violation are readily distinguishable from the instant case. In *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Supreme Court found the Confrontation Clause violated by the admission of prior testimony from a preliminary hearing where the witness who had given the prior testimony did not even testify at trial. In *Mayes v. Sowders*, 621 F.2d 850 (6th Cir.), *cert. denied*, 449 U.S. 922, 101 S.Ct. 324, 66 L.Ed.2d 151 (1980), the co-defendant whose prior statement to a police officer implicating the defendant was admitted into evidence testified at trial but only "gave his name and address, answered two questions put to him by the prosecutor in the negative, and thereafter refused to testify further despite a conference in the Judge's chambers and ultimately a contempt citation by the court." *Id.* at 853. Further, in holding that the admission of the prior statement violated the Sixth Amendment, the court in *Mayes* noted that "[i]n addition to [the witness's] refusal to testify (and because of it) the ability of defense counsel to cross-examine [the witness] was limited by several rulings by the trial judge." *Id.* at 854.

Finally, the Fourth Circuit in *United States v. Garner*, 574 F.2d 1141 (4th Cir.), *cert. denied*, 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978), held that the admission of the prior grand jury testimony of a witness who claimed a memory loss at trial did *not* violate the Sixth Amendment, but so held solely on the ground that the prior testimony was reliable and strongly corroborated by other evidence given at trial. *Id.* at 1146. The court also observed that despite his memory lapses the witness did testify,

was cross-examined to some extent by defense counsel, and denied the truth of his prior grand jury testimony. *Id.* Nevertheless, after making this observation, the court stated: "We do not hold, however, that this cross-examination under these difficult circumstances was adequate to meet the requirements of the Confrontation Clause." *Id.* We do not read this statement as an affirmative holding by the Fourth Circuit that the cross-examination in *Garner* would not have been constitutionally sufficient, but rather as an express determination not to decide the sufficiency of the cross-examination where the court was able to decide the constitutional issue on another ground. Moreover, the cross-examination of Brown, unlike that of the witness in *Garner,* also included the use of numerous prior statements of Brown's that further served to impeach the credibility of his prior grand jury testimony.

8. DiCaro argues that the jury could not have believed Willis's testimony that he saw two men, one of whom Willis identified in court as DiCaro, pull their masks off in front of him during the robbery. According to DiCaro, the notion that two men would suddenly pull off their masks and show their faces in front of both Willis and the janitor, whom Willis was guarding, "defies belief." In his grand jury testimony, however, Brown stated that he had placed a hood over the janitor's head, so that he would not have been able to see the two men despite their removal of the masks. On this record, we cannot find Willis's in-court identification so incredible as to preclude a rational jury from relying upon it in assessing DiCaro's guilt.

the Hobbs Act count does not provide a basis for reversing DiCaro's conviction. Assuming, *arguendo*, that these verdicts were inconsistent, it is well-settled that "as long as the evidence was sufficient to support the counts on which the defendant was actually convicted, a jury verdict reflecting compromise or even inconsistency is permissible and legitimate." *United States v. Fields*, 689 F.2d 122, 125–26 (7th Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982). *See United States v. Powell*, —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *United States v. Lendmann*, 757 F.2d 916, 918 n. 1 (7th Cir.1985); *United States v. McComb*, 744 F.2d 555, 566 (7th Cir.1984).

### V.

For these reasons, DiCaro's RICO conviction is reversed, and his Hobbs Act conviction is affirmed.