T.C. Memo. 1997-281

UNITED STATES TAX COURT

JOAO MONTORO AND NEUZA PAULA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6182-95.                    Filed June 23, 1997.

<u>Charles L. Steel IV</u>, for petitioners.

<u>Jeanne Gramling</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income tax and additions to tax as follows:

|  |  | Additions to Tax | | Penalty |
|  |  | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)[1] | 6661 | 6662 |
| 1987 | $5,592 | $280 | $1,398 | -- |
| 1988 | 4,604 | 230 | -- | -- |
| 1990 | 33,961 | -- | -- | $5,007 |
| 1991 | 96,366 | -- | -- | 17,108 |

[1] Respondent determined that petitioners are liable for an addition to tax for negligence under sec. 6653(a)(1)(A) for 1987, 50 percent of the interest due on the underpayment attributable to negligence under sec. 6653(a)(1)(B) for 1987, and an addition to tax for negligence under sec. 6653(a)(1) for 1988.

After concessions,[1] the issues for decision are:

(1) Whether petitioners' taxable income from International Best Buys was $23,574 in 1990 and $147,426 in 1991, as petitioners contend; $131,508 in 1990 and $396,905 in 1991, as respondent contends; or some other amount. We hold that petitioners' income from International Best Buys was $64,910 in 1990 and $201,992 in 1991.

(2) Whether petitioners may carry back net operating losses of $15,976 to 1987 and $15,491 to 1988. We hold that they may not.

(3) Whether petitioners are liable for (a) additions to tax for negligence under section 6653 for 1987 and 1988 and substantial understatement of income tax under section 6661 for 1987; and (b) the accuracy-related penalty under section 6662(a) for 1990 and 1991. We hold that they are.

---

[1] Petitioners concede that they failed to report the following income:

|                                    | 1990     | 1991     |
|------------------------------------|----------|----------|
| IBM tax payments for Mr. Paula     | $44,069  | $51,271  |
| IBM severance payment to Mr. Paula | --       | 36,808   |
| Wages paid to Mrs. Paula by A&P    | 1,609    | --       |
| Interest                           | 2,542    | 943      |

Respondent concedes that petitioners are entitled to a foreign tax credit of $7,510.83 for 1991 relating to the IBM severance payment to Mr. Paula. Respondent also concedes that petitioners may deduct a $141 penalty they paid in 1990 as the result of a premature withdrawal of funds from a certificate of deposit.
The Court expects the parties to compute petitioners' self-employment tax liability and personal exemption phase-out (if applicable) under Rule 155.

(4) Whether certain exhibits offered by respondent to impeach the testimony of petitioner-husband are admissible. We hold that they are not.

References to petitioner-husband are to Joao Montoro Paula. References to petitioner-wife are to Nueza Paula. Section references are to the Internal Revenue Code in effect for the years in issue. Unless otherwise indicated, rule references are to the Tax Court Rules of Practice and Procedure, and references to income tax returns are to United States (Federal) income tax returns.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioners

Petitioners lived in Raleigh, North Carolina, when they filed the petition in this case. Petitioner-husband was born and raised in Brazil. He graduated from college there and has degrees in chemical engineering and business administration. Sometime before 1972, petitioner-husband worked for Ford Motor Co. in Brazil for 6 years and was promoted to a management position.

Petitioners have three sons: Luiz, born in 1970; Ricardo, born in 1972; and Leandro, born in 1975.

Petitioners have had an apartment in Brazil from 1984 until the time of trial. Petitioners were resident aliens of the United States during the years in issue.

B.   1986 Revaluation of Brazilian Currency

On February 28, 1986, Brazil significantly revalued the cruzeiro (Cr$).  Beginning February 28, 1986, the Brazilian currency was the cruzado (Cz$).  One cruzado equals 1,000 cruzeiros.[2]  "Brazilian Cruzeiro/Cruzado," 1986-1987 World Currency Yearbook, 242-249 (Philip P. Cowitt, ed. 1989).  The exchange rate was Cr$ 13,020 per U.S. dollar in February 1986 and Cr$ 13.84 per U.S. dollar in March 1986.

C.   Petitioner-Husband's IBM Employment

In 1972, petitioner-husband began to work for IBM-Brazil in Campinas, Sao Paulo, Brazil.  He worked for IBM for 18 years in Brazil and the United States.  In 1987, he began to work for IBM in Raleigh, North Carolina.  In late 1989 or early 1990, he returned briefly to Brazil to work for IBM-Brazil.  He soon took a leave of absence from IBM and returned to the United States.

IBM wanted petitioner-husband to work in Brazil.  He resigned from IBM in January 1991 because his family wanted to stay in the United States.

D.   Petitioners' Assets in Brazil in 1986

---

[2] The average official exchange rate was $1 to Cr$ 1841.50 for 1984, and $1 to Cr$ 6205.10 for 1985.  Federal Reserve Bulletin, International Statistics (Sept. 1986; Mar. 1987), Foreign Exchange Rates.  On Feb. 28, 1986, the official exchange rate of cruzados to U.S. dollars was $1 to Cz$ 13.84.  See Norwest Corp. v. Commissioner, 108 T.C. __ n. 19 (Apr. 30, 1997). The parties stipulated that the exchange rates for 1986 were as listed in the Federal Reserve Bulletin:  Jan. Cr$ 11345.26; Feb. Cr$ 13020.00; Mar.-Sept. Cr$ 13.84 (after the currency reform); Oct. Cr$ 13.98; Nov. Cr$ 14.10; and Dec. Cr$ 14.54.

1.  <u>Real Property</u>

In 1985, petitioners built a home at 909 Rua Madre Maria Santa Margarida in Campinas, Sao Paulo.  They owned the home in 1986.  They also owned vacant land at Rua Jose Jorge Farah in Campinas, a house at 108 Rua Luiz Gama in Sorocaba, and an apartment in Mongagua.  In 1986, petitioners began to build a house on the Rua Jose Jorge Farah lot.

2.  <u>Personal Property (Telephone and Automobiles)</u>

In 1986, petitioners owned the telephone line for the house on Rua Madre Maria Santa Margarida.  In Brazil, an individual may buy a telephone line.  Once purchased, the owner may resell it. They also owned two automobiles, a Ford Corcel and a Volkswagen Santana.

3.  <u>Petitioner-Husband's Inheritances</u>

Petitioner-husband inherited Cr$ 415,200 ($30,000)[3] in March 1986 from his father.  In September 1986, petitioner-husband inherited Cr$ 1,660,800 ($120,000) from his father.

4.  <u>Sale of Petitioners' Assets in Brazil in 1986</u>

In 1986, petitioners sold all of their Brazilian assets, except their apartment in Mongagua.  Petitioners sold the unfinished house at Rua Jose Jorge Farah to petitioner-husband's

---

[3] U.S. dollar amounts following cruzeiro or cruzado amounts are the contemporaneous equivalents.

brother.  Petitioner-husband reported the sale of these assets on the Brazilian income tax return he filed for 1986.[4]  In signing the 1986 Brazilian return, petitioner-husband attested to its truth.  Petitioners reported that, at the end of 1986, their Brazilian assets (consisting primarily of cash) totaled Cr$ 5,173,690 ($355,825).  Petitioners kept the cash from the sale of these assets in a safe in Brazil.

E.    Petitioners' Trips to and Movement of Cash From Brazil

In 1990, petitioner-husband traveled to Brazil four times. He returned to the United States from the first trip on March 16. Petitioners' son, Leandro, played soccer for the Raleigh Flyers. In the summer of 1990, petitioner-husband took the team to Brazil.  He returned to the United States on July 5 or 6, 1990. He returned from his next trips on September 19 and November 16. He brought cash from their safe on each of these trips. Petitioners used this money to pay their rent and other living expenses, their son's college tuition, and to provide funds for petitioner-husband's business, International Best Buys (discussed at par. F below).

---

[4] Brazilian law did not require petitioner-wife to sign the Brazilian tax return.

In 1990, petitioners deposited $136,408 in nine bank accounts (eight in the United States and one in Brazil). Of that amount, the following is nontaxable:

| Date | Check/currency | Amount deposited | Source of funds |
|------|----------------|------------------|-----------------|
| 4/12 | travelers checks | $1,790 | Mar. Brazil trip |
| 4/24 | Cr$ 1,679,225.87 | 30,531 | Brazilian account |
| 7/9 | unknown | 7,300 | July Brazil trip |
| 7/11 | currency | 3,200 | July Brazil trip |
| 8/22 | travelers checks | 4,000 | July Brazil trip |
| 9/25 | currency | 1,007 | Sept. Brazil trip |
| 9/25 | currency | 1,436 | Sept. Brazil trip |
| 11/20 | currency/trav. check | 2,088 | Nov. Brazil trip |
| 11/20 | currency | 6,596 | Nov. Brazil trip |
| 12/3 | currency[5] | 6,400 | Transfer |
| 12/3 | check | 2,250 | Cashed check for friend |
| | Total | $66,598 | |

In 1991, petitioner-husband brought cash from their safe after each of several trips to Brazil. Petitioner-husband sometimes kept the cash he brought from Brazil in a safe in his Raleigh office before he deposited it in petitioners' non-interest bearing checking accounts. Petitioners deposited $396,905 in eight (seven U.S. and one Brazilian) bank accounts. Of the $396,905, petitioners deposited Cr$ 14,651,647.28 ($48,009) in the Bank of Itau in Brazil from their personal assets, and they made nontaxable deposits to U.S. bank accounts as follows:

---

[5] This deposit was a transfer from account 157460395.

| Date | Check/currency | Amount deposited | Source |
|------|----------------|------------------|--------|
| 1/21 | currency | $ 4,650 | Jan. Brazil trip |
| 1/22 | currency | 1,120 | Jan. Brazil trip |
| 1/23 | currency | 200 | Jan. Brazil trip |
| 2/1 | currency | 6,680 | Jan. Brazil trip |
| 4/4 | currency | 9,500 | Apr. Brazil trip |
| 4/4 | currency | 9,500 | Apr. Brazil trip |
| 4/4 | currency | 9,500 | Apr. Brazil trip |
| 4/5 | currency | 7,000 | Apr. Brazil trip |
| 4/23 | check | 640 | PanAm refund |
| 5/3 | check | 8,000 | exchanged money |
| 6/4 | currency | 2,900 | June Brazil trip |
| 6/21 | currency | 500 | June Brazil trip |
| 7/18 | check | 45 | manufacturer's rebate |
| 7/26 | travelers checks | 4,000 | July Brazil trip |
| 11/22 | currency | 3,000 | Nov. Brazil trip |
| 12/26 | currency | 4,800 | Dec. Brazil trip |
| | Total | $72,035 | |

On some of his trips to Brazil in 1991, petitioner-husband took money from the safe and gave it to his secretary. He instructed her to use the money to pay expenses, such as Social Security, and to wire him the balance. Petitioners deposited the following funds from wire transfers (from nontaxable sources) in their U.S. accounts in 1991:

| Date | Amount deposited | Source |
|------|------------------|--------|
| 4/4 | $20,000 | personal assets in Brazil |
| 5/29 | 15,900 | Money returned to manufacturer for jewelry consignment |
| 7/24 | 5,500 | personal assets in Brazil |
| 9/30 | 8,469 | personal assets in Brazil |
| 10/9 | 10,000 | personal assets in Brazil |
| 10/17 | 15,000 | personal assets in Brazil |
| Total | $74,869 | |

F.  International Best Buys

In February 1987, petitioner-husband started an import business in Raleigh called International Best Buys

(International) in partnership with Mrs. Joyner (Joyner). Joyner was petitioner-husband's English teacher in the United States. Petitioner-husband and Joyner formed International to sell costume jewelry that they imported from Brazil. Petitioners did not attach a Schedule C (Profit or Loss From Business (Sole Proprietorship)) for International to their 1987 and 1988 returns.

In 1989, Joyner transferred her interest in International to petitioner-wife. The record does not show how much petitioners invested in the partnership or how much they paid Joyner for her interest. In 1989, petitioner-husband bought silver jewelry for International to sell in the United States. He attended trade shows in San Antonio and other places to try to sell merchandise.

Petitioner-husband began to work full-time for International in 1990. International's sales of jewelry were poor, and the company lost money in 1990 and 1991. In 1990 and 1991, International was a sole proprietorship. Petitioners attached a Schedule C for International to their 1990 and 1991 returns.

International began to export electronic components to Brazil in 1990. Petitioner-husband continued to export electronic components to Brazil in 1991 and stopped importing jewelry from Brazil. His export sales grew in 1991 and 1992. International had gross receipts of $64,910 in 1990, $201,992 in 1991, about $400,000 in 1992, and about $1.3 million in 1993.

G.    Petitioners' U.S. Tax Returns

    1.    Petitioners' Tax Return Preparer

Michael Perkins (Perkins), a certified public accountant in Raleigh, prepared petitioners' tax returns for tax years 1989 to 1993.  Perkins and petitioner-husband have been friends for more than 10 years.  Their sons played soccer together.  Perkins and his son accompanied petitioner-husband on the soccer team's trip to Brazil in 1990.

Perkins reviewed some receipts for earlier years to ensure that petitioner-husband complied with U.S. tax requirements for deducting business and travel expenses, but he primarily relied on the worksheets furnished by petitioner-husband.  At trial, Perkins did not remember whether he saw sales receipts, invoices, journals, or ledgers for International for the years in issue.

    2.    Petitioner-Wife's Import Business

Petitioner-wife's import sales business had gross receipts of $4,900 in 1990.  Petitioners included that amount in the gross receipts reported on petitioner-husband's Schedule C for International for 1990.  Petitioners did not file a separate Schedule C for petitioner-wife's import sales business with their original 1990 return.  Petitioners reallocated $4,900 from petitioner-husband's International business to petitioner-wife's Schedule C attached to their amended return for 1990. Petitioner-wife had costs of goods sold and expenses totaling

$3,752 from her import sales business in 1990, as petitioners reported on their amended return for 1990.

### 3. International

Petitioners reported that International had gross receipts of $23,574 in 1990 and $147,426 in 1991, cost of goods sold and expenses of $39,550 in 1990 and $162,917 in 1991, and losses of $15,976 in 1990 and $15,491 in 1991.

Petitioner-husband deducted Schedule C expenses for International of $22,963 in 1990 and $30,234 in 1991. The parties agree that petitioners' taxable income should be decreased by $1,119 in 1990 and increased by $4,670 in 1991 because of changes to International's Schedule C expenses for those years.

### 4. Net Operating Loss Carrybacks

Petitioners reported net operating losses of $15,976 on their original return ($14,448 on the amended return) for 1990 and $15,491 on their return for 1991. Petitioners elected to carry the net operating losses back to 1987 and 1988 by filing Forms 1045. Petitioners' net operating losses equaled the Schedule C losses from International in 1990 and 1991.

## H. Respondent's Examination

Revenue Agent Margaret Davis (Davis) began to examine petitioners' returns for 1990 and 1991 late in 1992. Davis asked petitioners for the books and records of International, including

receipts and disbursements journals, the general ledger, work papers, adjusting journal entries, canceled checks, bank statements, and deposit slips for all accounts for 1990. Petitioners gave her some of the bank statements, but did not give her International's books and records. In November 1992, Davis asked petitioners for their canceled checks from December 1, 1989, to January 31, 1991. Petitioner-husband told her that he had destroyed them.

On November 4, 1992, Davis asked petitioner-husband how much cash on hand he had. Davis did not specify whether "cash on hand" included cash petitioners may still have had in Brazil. Petitioner-husband did not understand it to include cash petitioners had in Brazil. Petitioner-husband told Davis that he had less than $500 in cash on hand at the beginning and end of 1990.

Petitioner-husband told Davis that he brought no more than $8,000 each time he returned from Brazil, two or three times a year.

On November 19, 1992, petitioner-husband told Davis that he had kept money in a safe in a house in Brazil until he sold the house in 1990. After he sold the house, he kept the safe elsewhere in Brazil. Petitioner-husband initially told Davis that he did not know whether he had more or less than $10,000 in

the safe, and that the money in the safe came from savings from his years of working for IBM and inheritances from his father.

On March 29, 1994, petitioner-husband gave Davis a revised estimate of the amount of his cash which included the proceeds from the sale of petitioners' assets in Brazil.

Davis did a bank deposits analysis to estimate petitioners' income for 1990 and 1991. She examined petitioners' bank accounts. She sought to exclude from her analysis sources of income which she thought were nontaxable, including transfers between accounts, expense reimbursements, and offsetting wire transfers. She apparently did not believe that petitioners had a significant amount of money in Brazil as of December 31, 1989.

Petitioners deposited $136,408 in nine bank accounts in 1990. They reported that they had received $23,574 of that amount as Schedule C gross receipts on their 1990 return. Respondent subtracted $23,574 and gross receipts of $4,900 allocated to petitioner-wife, and determined that petitioners had understated their taxable income for 1990 by $107,934.

Petitioners deposited $396,905 in eight bank accounts in 1991, $147,426 of which they reported on their 1991 return as Schedule C gross receipts. Respondent determined that petitioners had understated their taxable income for 1991 by $249,479 ($396,905 - $147,426).

OPINION

A.   <u>Admissibility of Exhibits AG and AH</u>

Three days before the trial in this case, respondent's counsel found in the files for this case a currency transaction report (Exhibit AG) and a criminal referral report prepared by the NCNB National Bank of North Carolina (Exhibit AH) and sent to the Office of the Comptroller of the Currency.  Respondent's counsel had seen these documents before, but had not thought that they were significant.  On the day before the trial, respondent's counsel called petitioners' counsel and told him that respondent might call Rose Wiseman (Wiseman), an administrative assistant at NationsBank in Raleigh, as a rebuttal witness.  Respondent had not listed Wiseman as a witness.  Respondent's counsel gave him Wiseman's name and telephone number, but did not give him a copy of Exhibits AG and AH.  Petitioners' counsel did not contact Wiseman.

At trial, petitioner-husband testified that he made three cash deposits totaling $28,500 on April 4, 1991, but that he did not remember the denominations of the currency he deposited. Respondent called Wiseman to impeach his testimony.  During Wiseman's testimony, respondent offered Exhibits AG and AH into evidence.  Exhibit AG reports that John M. Paula made a $28,500 cash deposit on April 4, 1991, and that the deposit was made to three accounts and consisted of $28,500 in $100 bills and larger.

Exhibit AH is a form Wiseman prepared and sent to the Comptroller of the Currency entitled "Criminal Referral Report". Wiseman prepared Exhibit AH based on information she received from the teller who handled the deposits. The report states:

> Mr. Paula came into the Towne North Branch of NCNB National Bank and made deposits totaling $28,500, in new, crisp $100 bills. The deposits were made into three separate accounts. The teller became suspicious because of the large dollar amount and the new bills.

At trial, petitioners objected to the introduction into evidence of Exhibits AG and AH because respondent did not exchange them with petitioners before offering them into evidence.

Five months before this case was calendared for trial, the Court's standing pretrial order was served on the parties. It stated in part:

> Any documents or materials which a party expects to utilize in the event of trial (except for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 15 days before the first day of the trial session.

Materials not provided in compliance with our pretrial orders may be excluded from evidence. Rules 104(c)(2), 132(b); Moretti v. Commissioner, 77 F.3d 637, 644 (2d Cir. 1996).

Respondent contends that Exhibits AG and AH impeach the testimony of petitioner-husband and, thus, need not be exchanged 15 days ahead of the first day of the trial session. We disagree. Respondent offered the currency transaction report

into evidence to show that petitioner-husband had made three cash deposits of $9,500 each on April 4, 1991, to three bank accounts. However, Exhibit AG does not differ substantially from his testimony. The bank's criminal referral report said that petitioner-husband deposited $28,500 in "new, crisp $100 bills" in three bank accounts. Respondent contends that this impeaches petitioner-husband's testimony that the money he deposited was from cash he had in his safe in Brazil since 1989. We disagree. The fact that the $100 bills were new and crisp in 1991 does not establish that the bills were issued after 1986; they may simply have been uncirculated. Thus, Exhibit AH does not impeach petitioner-husband's testimony that the cash he deposited was from his safe in Brazil.

Respondent contends that petitioner-husband's lack of memory about the nature of the April 4, 1991, deposits is analogous to a denial. Respondent relies on United States v. DiCaro, 772 F.2d 1314, 1321-1322 (7th Cir. 1985); United States v. Rogers, 549 F.2d 490, 496 (8th Cir. 1976). Respondent's reliance on those cases is misplaced. In United States v. DiCaro, supra at 1321-1322, a witness had testified to certain facts before a grand jury but claimed to have forgotten those facts by the time of trial. See, e.g., United States v. Murphy, 696 F.2d 282, 284 (4th Cir. 1982) (witness' lack of memory impeached by his prior grand jury testimony); United States v. Rogers, 549 F.2d 490,

495-496 (8th Cir. 1976) (witness' lack of memory impeached by prior written statement given to FBI agent). That is not the case here. Petitioner-husband did not previously state or testify that he deposited new $100 bills; his lack of specific memory is believable under the circumstances, unlike the cases respondent cites. Thus, the documents do not impeach petitioner-husband's lack of memory.

Respondent contends that the documents are admissible under rule 801(d)(2)(A) of the Federal Rules of Evidence as admissions by a party. We disagree. Since respondent did not exchange the documents with petitioners in compliance with the standing pretrial order, they are admissible only to impeach testimony, by agreement of the parties, or for good cause shown. Respondent has not shown good cause for not complying with the pretrial order. Respondent knew 2 years before trial that petitioners contended that the money they deposited was from their Brazilian funds and should have exchanged Exhibits AG and AH with petitioners as part of the stipulation process. Respondent's failure to exchange the documents led to the type of surprise that the pretrial order and Rule 91 were designed to prevent. Barkley Co. v. Commissioner, 89 T.C. 66, 70 (1987); see Branerton Corp. v. Commissioner, 61 T.C. 691 (1974). We conclude that Exhibits AG and AH are not admissible.

B.   Deficiency

   1.   Respondent's Use of the Bank Deposits Method

We must decide whether, as respondent contends, petitioners had unreported income in the amounts of $107,934 in 1990 and $249,479 in 1991. Respondent reconstructed petitioners' income using the bank deposits method. Petitioners agree that they deposited $136,408 in their bank accounts in 1990 and $396,905 in 1991.

If a taxpayer does not maintain adequate books and records, respondent may reconstruct a taxpayer's income by any reasonable method which clearly reflects income, sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954), including the bank deposits method. Parks v. Commissioner, 94 T.C. 654, 658 (1990); Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, supra at 656-657. Where the taxpayer suggests a nontaxable source, the Commissioner must either connect the bank deposits to a likely source of taxable income or negate the nontaxable source alleged by the taxpayer. Kramer v. Commissioner, 389 F.2d 236, 239 (7th Cir. 1968), affg. T.C. Memo. 1966-234.

Respondent's determination is presumed to be correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners bear the burden of proving that unexplained deposits are not taxable

to them. DiLeo v. Commissioner, 96 T.C. 858, 869 (1991), affd. on other grounds 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, supra at 658.

    2.   Whether Petitioner-Husband's Testimony Was Generally Credible

Petitioners contend that they had the money for the bank deposits in Brazil before 1990 and brought it to the United States in 1990 and 1991. Respondent contends that petitioner-husband's testimony regarding their Brazilian funds is self-serving and lacks credibility.

We decide whether a witness is credible based on objective facts, the reasonableness of the testimony, the consistency of statements made by the witness, and the demeanor of the witness. Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964); Pinder v. United States, 330 F.2d 119, 124-125 (5th Cir. 1964); Concord Consumers Housing Coop. v. Commissioner, 89 T.C. 105, 124 n.21 (1987). We may discount testimony which we find to be unworthy of belief, but we may not arbitrarily disregard testimony that is competent, relevant, and uncontradicted, Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), affg. 99 T.C. 370 (1992), and T.C. Memo. 1992-616; Demkowicz v. Commissioner, 551 F.2d 929, 931-932 (3d Cir. 1977), revg. T.C. Memo. 1975-278; Banks v. Commissioner, 322 F.2d 530, 537 (8th Cir. 1963), affg. in part and remanding in part T.C. Memo. 1961-237; Loesch & Green Constr. Co. v. Commissioner, 211

F.2d 210, 212 (6th Cir. 1954), revg. and remanding a Memorandum Opinion of this Court. Petitioner-husband's testimony was plausible and, we believe, generally truthful.

3. <u>Whether Respondent Investigated Leads</u>

Petitioners argue that respondent did not investigate relevant leads to their nontaxable sources of deposits. We disagree. Petitioners first told Davis that they had a substantial cash hoard in Brazil in March 1994. Respondent could not independently verify how much money they had in Brazil. Respondent determined that International was a likely source of petitioners' deposits. Petitioners did not give respondent International's books and records so respondent could not verify the extent to which International was a likely source of income.

4. <u>Whether Respondent Subtracted Nontaxable Sources of Deposits in Reconstructing Petitioners' Income</u>

Respondent contends that respondent properly reconstructed petitioners' income for 1990 and 1991 using the bank deposits method by subtracting from petitioners' income nontaxable sources of deposits including transfers between bank accounts, expense reimbursements, and offsetting wire transfers. As discussed below, we conclude that respondent did not subtract all nontaxable sources of deposits to petitioners' U.S. bank accounts.

Respondent contends that petitioners have not proven that their bank deposits in 1990 and 1991 were from cash that they had at the end of 1989. Respondent contends that petitioners kept

poor records, did not show how much cash they had on December 31, 1989, and gave inconsistent estimates of their cash on hand on that date. Respondent points out that petitioner-husband initially told Davis that he had less than $500 in cash at the beginning and end of 1990. We believe that petitioner-husband's answer was consistent because he did not think Davis intended cash on hand to include money he had in Brazil.

Petitioner-husband initially told Davis that he brought no more than $8,000 from Brazil two or three times a year. However, he made that statement to Davis before he told her about the significant amount of funds petitioners had in Brazil at the end of 1989. We are convinced that petitioner-husband brought more than $8,000 twice a year in 1990 and 1991.

As discussed above, we believe much of petitioner-husband's testimony about petitioners' cash on hand in 1990.

5. <u>Values Stated on Petitioners' Brazilian Tax Returns</u>

Petitioners contend that their 1986 Brazilian tax return shows that they had $534,160 (in U.S. dollars) in cash on December 31, 1986. We disagree. Petitioners reported on their 1986 Brazilian return that they had Cr$ 4,753,690 ($326,939) in cash and the apartment in Mongagua worth Cr$ 420,000 ($28,886), for a total of $355,825.

Petitioner-husband testified that petitioners had $328,975 in cash and $209,244 for the "difference of the sales" in December 1986, which they contend is supported by deeds showing

the purchase and sale of petitioners' real property in Brazil. Petitioner-husband did not define the phrase the "difference of the sales". As discussed below, we find that petitioners had $326,939 in cash in December 1989.

Petitioner-husband testified that he sold the Rua Jose Jorge Farah property for $150,000 and the house at Rua Madre Maria Santa Margarida for $140,000. Respondent points out that these amounts are inconsistent with the amounts petitioners reported on their 1986 Brazilian return. We agree. Petitioner-husband reported that he sold the Rua Jose Jorge Farah property for Cr$ 1,660,000 ($119,942) and the Rua Madre Maria Santa Margarida house for Cr$ 1,972,600 ($135,667) on petitioners' 1986 Brazilian return.

Statements in a U.S. Federal tax return are admissions under Rule 801(d)(2) of the Federal Rules of Evidence and will not be overcome without cogent evidence that they are wrong. Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989); Lare v. Commissioner, 62 T.C. 739, 750 (1974), affd. without published opinion 521 F.2d 1399 (3d Cir. 1975). In signing the Brazilian return, petitioner-husband attested to its truth. We believe it is appropriate to apply this doctrine to petitioners' Brazilian returns. Thus, we find that petitioners sold the Rua Jose Jorge Farah property for $119,942 and the Rua

Madre Maria Santa Margarida house for $135,667 as reported on their 1986 Brazilian return.

6. Petitioners' Deposits from Nontaxable Sources

a. Petitioners' Contentions

Petitioners contend that petitioner-husband brought $8,000 back from a trip to Brazil on July 17, 1991, and deposited it 2 days later. We disagree. The July 19, 1991, deposit was made by wire transfer. We have not included this amount as a nontaxable source of funds.

Petitioners contend that petitioner-husband made a $20,000 deposit to one of his joint accounts with Mr. Simoes on September 25, 1990, from nontaxable funds. We disagree. Petitioner-husband told Davis that Mr. Simoes gave him $20,000 to buy parts or to pay Underwriters' Laboratories. In contrast, petitioner-husband testified that Mr. Simoes gave him the money to buy samples, that Mr. Simoes lent him the $20,000, and that the money was to pay Mr. Simoes' expenses while he was in the United States. Petitioner-husband's explanations are inconsistent, and we have not included this amount in petitioners' nontaxable sources of funds.

Petitioners contend that a $29,307 wire transfer from the Cayman Islands to one of their accounts in August 1991 was money Mr. Arnaldo was holding for petitioner-husband in Brazil. We disagree because Mr. Arnaldo's name is not on the record of the

wire transfer.  We have not included this amount in petitioners' nontaxable sources of funds.

### b.    Respondent's Contentions

Respondent contends that the inheritance check petitioner-husband received from his father was worth about $120, using the August 1986 exchange rate of Cz$ 13.84.  We disagree. Respondent's contention about the value of petitioner-husband's inheritance is contrary to the stipulated exchange rates for dollars and cruzeiros in August 1986.

Respondent points out that petitioner-husband told Davis that there were no records of the inheritance check he received from his father, but at trial he offered into evidence a copy of the check for Cr$ 1,660,800 ($120,000).  We admitted the check because petitioner-husband had given respondent the number of the check about a month before trial.

Respondent points out that petitioner-husband told Davis that he was uncertain whether he had more or less than $10,000 in the safe.  Respondent contends that this is inconsistent with petitioner-husband's later claim that he kept a large amount of cash in the safe.  Respondent's point seeks to make something out of nothing.  We believe that petitioner-husband kept money in the safe in Brazil but did not initially tell Davis the amount. Petitioner-husband wrote to Davis in March 1994 and revised his estimate of petitioners' cash on hand to include funds from the sale of petitioners' Brazilian assets.

Respondent contends that petitioner-husband told Davis during the examination that wire transfers to petitioners' bank accounts were from Brazilian business customers who wired sales revenue to him.  Petitioner-husband later told Davis and testified that other people, including his sister, sent him money from Brazil.

Petitioner-husband testified that only petitioners had access to their safe in Brazil.  Respondent contends that petitioner-husband told Davis that wire transfers from MTB, Cayman Islands, were sales revenue from a customer (MTB), but later told her and testified that three or four people, including his secretary and his sister, wired him money from Brazil.  He told Davis that his sister asked a person with an account outside of Brazil to wire the money.

We believe that petitioner-husband satisfactorily explained the wire transfers to petitioners' U.S. accounts.  Petitioner-husband credibly testified that, as his business started to grow and he needed more money to invest in it, he had several people, including his sister and his secretary, wire money from Brazil to petitioners' U.S. accounts.  He testified that, on some of his trips to Brazil, he took money from the safe, gave it to his secretary to pay expenses such as Social Security, and she wired him the balance.  He also testified that MTB is a bank and denied telling Davis that it was a customer.  He also testified that he collected a few thousand dollars from two customers in Brazil.

Petitioner-husband credibly testified that $58,969 of the 1991 wire transfers (including $50,500 from the Cayman Islands) to petitioners' bank accounts were from his own money in Brazil. His testimony is consistent with the documentary evidence. We have found that other wire transfers were from taxable sources.

On March 29, 1994, petitioner-husband told Davis that he had obtained the funds for a $6,400 deposit in December 1990 from his funds in Brazil on a November 16, 1990, trip. In contrast, he testified that the deposit resulted from a bank-to-bank transfer. Bank records corroborate his testimony; there was a $6,400 withdrawal from account 157460395 on December 3, 1990, and a $6,400 deposit to account 6269-258236 on December 3, 1990.

Respondent contends that petitioners' deposits to their accounts were not made from cash petitioner-husband brought from Brazil because petitioner-husband or petitioner-wife waited up to 1 month after petitioner-husband returned to the United States to deposit money in one of their accounts. We disagree for the most part. Petitioner-husband sometimes kept the money in a safe in his Raleigh office before he deposited it in his non-interest bearing checking accounts. To the extent that petitioner-husband did not convince us that deposits were from nontaxable sources, we did not include those deposits as a nontaxable source of funds.

Respondent contends that the fact that petitioner-husband used the 108 Rua Luiz Gama address as his address on his 1989

adjusted Brazilian tax return and 1991 Brazilian tax return shows that petitioners did not sell that house in September 1986. We disagree; we give more weight to the fact that petitioners reported the sale of and paid tax on the Rua Luiz Gama property on their 1986 Brazilian tax return than we do to the fact that petitioner-husband used that address on his 1989 and 1991 Brazilian returns, filed when petitioners were no longer living in Brazil.

Respondent argues that petitioners did not have a substantial amount of funds in 1990 because petitioner-husband testified[6] that he spent all of the money he brought from Brazil to the United States accompanying the Raleigh Flyers soccer team to tournaments in the United States for 5 years. We disagree. We do not believe that petitioner-husband meant that he actually spent all of his money following the soccer team.

### c.   Conclusion

Petitioners owned and sold real property and other assets in Brazil in 1986, and petitioner-husband brought cash into the United States when he returned from trips to Brazil. About half of petitioners' deposits in 1990 and 1991 came from the cash that

---

[6] Petitioner-husband testified as follows:

Q  * * * why did you take a soccer team to Brazil?

A  * * * I was following since 19-- five years, that I was following that team, you know, expending all the money that I brought from Brazil in hotels, in tournaments, here in the United States, you know, following * * * [those] boys.

they had accumulated by the end of 1986 from the sale of most of their Brazilian assets and inheritances they received in 1986. We find that, of the disputed deposits, $66,597.25 in 1990 and $194,913 in 1991 came from petitioners' funds in Brazil and from other nontaxable sources, such as transfers between accounts, cashing checks or exchanging money for friends, the PanAm refund, and a manufacturer's rebate. Petitioners have not shown that the source of the funds for the remaining items in dispute was nontaxable. We conclude that petitioners had income from International of $64,911 for 1990 and $201,992 for 1991.

C.    Net Operating Loss Carrybacks

Petitioners contend that they had losses of $15,976 in 1990 and $15,491 in 1991 which they may carry back to 1987 and 1988.

Section 172 allows a taxpayer to deduct net operating losses. Petitioners bear the burden of proving that they had net operating losses in 1990 and 1991. Rule 142(a); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955). Petitioners must prove the amount of the net operating loss carryback. Sec. 172(c); Jones v. Commissioner, 25 T.C. 1100, 1104 (1956), revd. and remanded on other grounds 259 F.2d 300 (5th Cir. 1958); Vaughan v. Commissioner, 15 B.T.A. 596, 600 (1929). Petitioners did not report income of $89,556 in 1990 and $143,588 in 1991. Petitioners did not show that they had net operating losses for 1990 and 1991 after taking into account the

income they did not report for those years.  Thus, we sustain
respondent on this issue.

D.    Additions to Tax and Penalty

     1.    Negligence

Negligence is a lack of due care or failure to do what a
reasonable and ordinarily prudent person would do under the
circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th
Cir. 1984), affg. 79 T.C. 714 (1982); Marcello v. Commissioner,
380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding
in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299; Neely v.
Commissioner, 85 T.C. 934, 947 (1985).  Petitioners must show
that they acted reasonably and prudently and exercised due care.
Neely v. Commissioner, supra.

Petitioners argue that they are not liable for additions to
tax for negligence and substantial understatement and the
accuracy-related penalty because they relied on their accountant
to prepare accurate returns for them for 1990 and 1991.
Petitioners point out that Perkins testified that petitioner-
husband prepared summaries of his business activities for 1990
and 1991, and that Perkins believed the summaries were accurate.

Good faith reliance on the advice of a competent,
independent tax professional may offer relief from the imposition
of the addition to tax for negligence.  United States v. Boyle,
469 U.S. 241, 251 (1985); Leonhart v. Commissioner, 414 F.2d 749,
750 (4th Cir. 1969), affg. T.C. Memo. 1968-98; Otis v.

Commissioner, 73 T.C. 671, 675 (1980). Petitioners bear the burden of proving that their reliance on professional advice was reasonable. Rule 142(a); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioners failed to explain why they did not report the IBM tax payments for petitioner-husband for 1990 and 1991 or his IBM severance payment in 1991, petitioner-wife's wages from A&P for 1990, or their interest income for 1990 and 1991. See supra, p. 2, note 1. Petitioners have not shown that their erroneous claim that they had net operating loss carrybacks to 1987 and 1988 was not due to negligence. Pappas v. Commissioner, 78 T.C. 1078, 1092 (1982) (taxpayer negligently omitted income for 1976, resulting in a net operating loss for 1976 which he carried back to 1973; taxpayer liable for negligence for 1973 and 1976). We hold that petitioners are liable for the addition to tax for negligence for 1987 and 1988.

2. Substantial Understatement

Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax in any taxable year. A substantial understatement exists if in any year the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1)(A). An understatement is the amount required to be

shown on the return less the amount actually shown on the return. Sec. 6661(b)(2)(A).

Petitioners contend that they are not liable for the addition for substantial understatement because they acted in good faith in relying on Perkins in filing their 1990 and 1991 returns. We disagree for the reasons stated at par. B-1, above. We sustain respondent's determination on this issue.

3. <u>Accuracy-Related Penalty</u>

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment due to negligence or disregard of rules or regulations or to a substantial understatement of income tax. Sec. 6662(a), (b)(1) and (2). Negligence includes a failure to make a reasonable attempt to comply with the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. Sec. 6662(c). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). Petitioners bear the burden of proving that they are not liable for the accuracy-related penalty imposed by section 6662(a). Rule 142(a).

Petitioners argue that they are not liable for the accuracy-related penalty because they relied on their accountant to prepare accurate returns for them for 1990 and 1991. Petitioners point out that Perkins testified that petitioner-husband prepared summaries of his business activities for 1990 and 1991, and that

Perkins believed there was no reason to question the accuracy of those summaries.  We disagree.

As discussed at par. B-1, above, petitioners offered no evidence showing what information or documentation they provided to Perkins concerning their IBM payments, wages from A&P, or interest income, and they did not explain why they did not report various income items for 1990 and 1991 including the income from International.  We hold that petitioners are liable for the accuracy-related penalty for 1990 and 1991 because they have not shown that they reasonably relied on Perkins.

Decision will be entered under Rule 155.